THE O. L. HALENBECK.

(District Court, S. D. New York. July 23, 1901.)

TUG AND TOW—CUTTING TOW ADRIFT IN STORM—LIABILITY OF TUG.

Evidence considered, and *held* sufficient to establish the claim that the action of an ocean tug in cutting adrift her tow, consisting of a dredge, four scows loaded with coal, and a water boat, during a moderate gale while off Cape Cod, and allowing them to drift on shore without any further effort to save them, was without necessity or justification, and rendered her liable for the loss.

In Admiralty. Proceeding for limitation of liability of tug for loss of tow.

Foley & Wray, for petitioners.

Worthington Frothingham, for damage claimant.

James J. Macklin, for Providence Washington Ins. Co.

BROWN, District Judge. At about half past 8 o'clock in the evening of October 6, 1900, the master of the powerful ocean steam tug O. L. Halenbeck, having in tow the dredge Empire State, four scows and a water boat, bound from New York to Boston, when about six miles south of Highland Light on the northern end of Cape Cod, and being then about two or two and one-half miles off shore, cut the whole tow adrift in a northeast storm, in consequence of which the tow drifted ashore within a couple of hours after, whereby the dredge suffered damages, and the other boats became a total loss. A suit for the damages having been instituted against the owner of the Halenbeck, and other claims existing, the above petition for limitation of liability was filed, and the tug appraised at $31,327. The petition denies that the loss happened through any negligence on the part of the Halenbeck, while the answers aver that the loss arose from negligence and bad management, and this is the chief issue in the case.

After passing through Hell Gate, the hawsers were all lengthened out, so that the dredge was about 1,000 feet behind the tug, and the other boats behind the dredge, forming a single line, were about 600 feet apart. They were loaded with coal. None had any motive power of their own, and the seven men in charge of them were all upon the dredge. Before leaving New York a code of signal whistles was arranged between the Halenbeck and Keegan, captain of the dredge, for the purposes of communication with each other as might be needed during the trip, the dredge having steam for a dynamo and electric lights and for her steam whistle.

On the evening previous to the loss the tug and tow had gone into Vineyard Haven, and on the next morning left there between 3 and 4 a. m. The weather was then mild and so continued, with light southerly winds and a smooth sea, until about 4 p. m., when the wind hauled to the eastward and northward, with increasing haziness, until at about 6:30 p. m. the wind was fresh from the northeast with a rising sea. At 7 the log says:

"5 miles about N. of Nausett Light; wind N. E., thick and raining: 7:30, wind increasing, making a heavy sea, pulled tow head to wind and sea; 8

p. m. wind increased to half a gale and heavy sea, still thick and raining; 8:15 p. m. got signals from dredge to take them off."

The testimony of Captain Cutler and of Brainerd, pilot of the tug, is, that some time before 8 o'clock they had considered that they might have to lose the dredge on account of the heavy wind and sea; that they thought the dredge would founder, and that it would be better to let her drift ashore, as something might thereby be saved. They also allege that a white light was seen waving on the dredge, which was taken to be a calling signal; other witnesses testify to seeing this, and to reporting it to the captain; one witness says it was seen waving 1,000 times, which, if true, would show that it was not a signal at all. But though alleging this "waving" light to be understood as a signal, it was not until from 15 to 30 minutes afterwards, according to the testimony of the master and pilot, Brainerd says half an hour, that the hawser was cut. Up to that time none of the pre-arranged signal whistles had been given by either the tug or the dredge. The tug on cutting the hawser went on the lee side of the dredge, heading towards her, and took the seven men from the dredge by means of the latter's life boat, and thereafter abandoned the tow. The storm was at its height at about 9 p. m., and was blowing then about 25 or 30 miles per hour, according to the estimate of the witnesses from Cahoon's Hollow life-saving station, and so continued till about 11 p. m., when it somewhat abated, and on the following morning the tug found the boats ashore from two to three miles south of Cahoon's life-saving station, which is about 8 miles north of Nausett Light.

Upon repeated examination of the testimony and consideration of all the circumstances, I am satisfied that the tug's abandonment of the tow and leaving it to drift ashore at that time with no further effort to save it, was neither justifiable nor excusable; and that the excuses given by the tug are without foundation in fact, if not knowingly fictitious.

When the hawser was cut the dredge was in no danger of foundering or of any material injury; no call for aid had been given, no signal lights had been displayed, none had been waved as alleged, nor had any signal whistles been given, as arranged for in case of distress; and when the master of the dredge, on going on board of the tug, requested her captain to put a line on the dredge again, the captain refused to do so, and now says he refused because no one would go aboard the dredge to make the line fast, though he made no request or attempt to have it done, and although the captain of the dredge wished to go again on board to extinguish a cabin lamp, but was not allowed to do so. The dredge was nearly new and one of the staunchest on the Atlantic coast.

The Halenbeck was one of the most powerful ocean tugs, and even assuming, what I cannot fully credit, that the moving white light was misunderstood as a signal, she cannot be justified in making no further attempt to preserve the tow. The master's present statement that the tug and all would in that case have gone ashore, cannot be verified and is without probability. The tug was then, he says, about two miles from shore, which was the usual distance.

There was not, therefore, any present danger of going ashore. The dredge was not beached until at least an hour and a half afterwards, and it would have been time enough to abandon the tow after attempts had been made to keep the tow off shore and after such attempts had been found unsuccessful by some near approach to the beach. The master says that the storm did not endanger the tug; and in pulling off shore the tug would always have been farthest off, her position would be approximately known by soundings, and if unsuccessful in keeping the tow off, which was over half a mile long, the tow could at any time when necessary have been cut loose. I cannot conceive that a master of reasonable prudence and nautical skill, had he been himself the owner of the tow, would for a moment have thought of abandoning it, or of "saving" it by letting it drift on Cape Cod beach, two miles distant, as was done in this case, without any further attempt to save it.

No doubt the northeast storm came on somewhat suddenly after 5 p. m., and at 9 o'clock amounted to a moderate gale, with a high sea lasting for two or three hours. Aside from this, everything material in the tug's story is accompanied by such exaggerations, such inconsistencies and such shifting defenses, as give it throughout an air of unveracity that deprives it of much credit.

The petition sets up, as did the answer in the previous suit, several important facts as alleged defenses, which are shown to be fictitious and false; viz. (a) that the tow by previous agreement was placed under the control of the captain of the dredge; this was disproved, no evidence was given to sustain it; and if true, the captain of the tug disregarded it in refusing to put a hawser to the tow again, as requested by the captain of the dredge after taking off the men; (b) that by previous arrangement the dredge, if in danger, was to signal the tug by displaying a red light, whereupon the tug was to go up and take off her men; there was no arrangement for the display of any signal light, whether red or white, but only for signal whistles; (c) that at about "9 p. m., when the storm had reached its height, the tug was signaled from the dredge" (meaning evidently by a red light) and that it was seen that the dredge and tow would founder and the men be lost "unless immediate action was taken to prevent it"; whereas there was no signal of any red light, the dredge had no red light on board; evidence was then given by the tug of a waving white light; this also was untrue, as there was nothing more than the motion of the dredge's usual and required white light in her rolling and pitching; nor was it "seen" that the dredge would founder; there was not the least indication of foundering, and nothing to see except spray coming over her bow doing no damage; she shipped no seas, and she made no water that the siphon did not empty; and instead of any "immediate action" by the tug on the pretended seeing of a waving light, no action at all was taken in reference to it for a quarter or a half hour afterwards, whereas action would naturally have been taken at once, had it been supposed to be a signal of distress.

The evidence derived from other tows, instead of aiding, weakens the tug's evidence. The tug Wrestler, a much smaller tug with canal

boats in tow bound for Boston, was about two hours in advance of the Halenbeck. She might have put into Provincetown, a safe harbor; but instead of doing so, she kept on throughout the storm, and though driven somewhat out of her course, she arrived safely without any foundering of her tow, or material damage, but with only the loss of some movable articles on deck. The boats of her tow had but two feet freeboard, while the dredge had five feet in the waist and over six feet at each end, with additional stout planking ahead. The petitioner's witness Carlson, who was on the tow Blackbird, an old boat with but two feet freeboard and which put into Provincetown, said his boat "could stand the increased wind and more outside." The dredge was a vastly stronger boat than any boat in the Wrestler's tow.

The evidence as to the Wrestler's towing shows how groundless is the testimony of the master that by going on with the dredge he would have "pulled her under and sunk her, losing both dredge and men." The captain testified that the dredge had only about six inches freeboard, and the above statement may have been based in part upon that supposition. She had in fact, as above stated, over six feet freeboard in front, and the captain's error, if real, was grossly negligent and inexcusable.

The hawser was cut, moreover, without any such signals as had been prearranged, and without any previous attempt at communication with the dredge to ascertain her condition or need; and after the men were taken off, no inquiry of that kind was made, no consultation with the dredge captain was had, and his request to take a line to the tow was unheeded. I discredit the testimony that the dredge captain proposed to go back to set fire to the dredge in order to collect the loss under a fire insurance policy.

Much of the testimony as to the height of the seas, and the force of the wind, are obviously gross exaggerations. The log entry at 8 p. m. showing then only "half a gale," and the statements of the men at the life-saving stations, satisfy me that at its height the wind was but a moderate gale, such as the tow was able to go through without material harm. Up to the time the hawser was cut, men were walking on the deck of the dredge, and loose articles, such as dishes, bottles and a lamp, stood unfastened upon the supper table, and her captain had no fears for her safety. The tow was then about six miles from Highland Light. The tide ran northward about one and one-half miles per hour, and it was at least an hour and a half before the tow drifted to the beach without having any help from the tug against the full force of the wind broadside on; so that had the Halenbeck again put a line on the tow, as requested, and continued pulling as she ought to have done, I think there can be no reasonable doubt, not only that the drifting landwards would have been very greatly delayed, if not completely prevented, but that with the favoring tide the tug would in two hours have cleared Highland Light, only six miles distant, and thereafter have had no further difficulty. It is not necessary for the defense to establish this probable result as a certainty. Even if the tug be justified in first cutting loose in order to take off the men as a proper precaution, this is no justification for

thereupon abandoning the tow, without any reasonable investigation or inquiry into its condition, or any further attempt made to save it during the considerable period available for doing so. The tug is, therefore, answerable for the loss unless she shows that any further endeavors to continue towing would certainly have been useless, which she has not shown, and could not possibly show.

I find, therefore, that the tug is liable to the extent of her appraised value. Beyond that the petitioner appears to be entitled to the usual decree in limitation of his liability.