STANDARD TRANSP. CO. v. GREAT LAKES TOWING CO.

(District Court, W. D. New York.  September 9, 1919.)

1. TOWAGE ⟢11(1)—IN ABSENCE OF GUARANTY ONLY ORDINARY CARE RE-
    QUIRED.
        In the absence of insurance or guaranty of safe delivery in the con-
    tract, the tug is required to exercise only ordinary care in the prosecu-
    tion of the voyage, and to provide the essential equipment to that end.
2. TOWAGE ⟢11(9)—TUG NOT REQUIRED TO BE ABLE TO WITHSTAND EVERY
    PERIL.
        It is sufficient if a tug is of sufficient power and is built and equipped
    to perform the service in normal weather conditions, and she is not re-
    quired to be able to withstand every peril, nor to be capable of rescuing
    her tow in all weather.
3. TOWAGE ⟢11(9)—TUG NOT IN FAULT IN LEAVING TOW AT ANCHOR IN UN-
    PRECEDENTED GALE.
        A tug *held* not in fault for injury to a barge, which she was towing
    down Lake Ontario and cast loose and left at anchor during an unprec-
    edented gale, which threatened to put out her fires and wholly disable her.

In Admiralty.  Suit by the Standard Transportation Company
against the Great Lakes Towing Company.  Decree for respondent.

Duncan & Mount, of New York City, and E. H. Gidley, of Buffalo,
N. Y. (O. D. Duncan, of Cleveland, Ohio, and Courtland Palmer and
Martin Carey, both of New York City, of counsel), for libelant.

Kelley & Cottrell, of Cleveland, Ohio, for respondent.

HAZEL, District Judge.  On November 19, 1916, the steam tug
T. C. Lutz, in agreement with the respondent owner of the barge
S. T. Co. No. 82, towed the latter from Cleveland, Ohio, to Mon-
treal, Canada, but on Lake Ontario a mishap occurred which is the
subject of this controversy.  It appears that after passing through
the Welland Canal and arriving at Port Dalhousie the tug and barge
proceeded out on the lake in fair weather, with a light wind from the
south and no sea running.  No storm signal was displayed, the weather
report stating, "Moderate to fresh. easterly winds tomorrow," which
did not indicate a change of weather of such character as to require
the tug, in the exercise of ordinary care, to halt and remain in shelter.
The Frederick E. Ives (D. C.) 25 Fed. 447.

On the following day thick weather and approaching darkness
caused the master of the tug to anchor the tow for the night on the
north side of Main Duck Island in Lake Ontario.  He left the
anchorage at 7 o'clock on the morning of November 24th for the chan-
nel at the head of the St. Lawrence river.  The wind was freshening
from the southwest, veering to west-southwest, and at 8:30 o'clock was
blowing gradually westward with increasing velocity to a gale of
approximately 70 miles an hour.  The sea was rising, the swell in-
creasing so that it was difficult to keep the barge, which was running
light, in the wake of the towing tug.  She sheered continuously on
the starboard quarter of the tug, and drew her down at times to the

level of the water, making it necessary for the tug to come around in the wind to avoid capsizing. The waves now and then dashed over the tug, causing her to labor heavily in the sea, and water found its way through the doors into the engine room.

Although the tug worked earnestly to keep the barge from making leeway and from drifting astern and toward Grenadier Island, she did not succeed. As she was proceeding ahead on Grenadier Island, the wind increased in velocity, changing to westward, and the swell of the sea became higher and more menacing, so that her master decided to alter the course of the tow under a shifting wind from southwest to west, and to make for shelter in the St. Lawrence river, with all possible speed. To accomplish this, however, it was necessary to head the tug northeast with the wind abeam—a maneuver that caused the tow to fall off even more to leeward. The master of the barge became anxious, and from soundings taken by him ascertained that the barge was dangerously close to the shoal off Grenadier Island. The tug labored hard in the gale for nearly two hours after leaving Main Duck Island, and when she passed the breakers at Grenadier Island, her master believed she was no longer dependable, that he could not reach the St. Lawrence river with the tow, and that the safety of the tug and crew required abandoning the barge. He thereupon signaled her to drop anchor. The barge coded a distress signal, but he nevertheless released the hawser, and the barge cast anchor, drifted a little on her anchor chains, and brought up over the breakers, where she rode heavily on the waves and pounded the bottom, with the result that her anchor chains broke and she drifted and stranded in a sheltering cove nearby. Afterwards, on November 29th, in calm weather, she was brought into deep water by the respondent tug, which had reached shelter in safety, and without further mishap was delivered at her destination.

The libel alleges negligence in the following respects: That the tow was not skillfully navigated; that the barge was allowed to drift toward the lee shore, when she should have been taken to a safe anchorage; that the tug should not have cast her off, and should have stood by; while the answer asserts in defense that the severe gale alone was responsible for the disaster, the main excuse for the abandonment of the barge being that the water came into the engine room and wet the coal, seriously interfering with keeping up steam; that the tug could not have returned to give assistance to the barge after the latter anchored, because of her inability to go close enough to take the barge's hawser; that in the opinion of the master of the tug the barge was in a reasonably safe position after she cast anchor; and, furthermore, that in all things good judgment was exercised.

[1] 1. The first contention by libelant is that the towage agreement was to tow the barge safely to Montreal; but I do not find any evidence of a special agreement guaranteeing safe towage. There was nothing in the agreement or surrounding circumstances to indicate that the respondent company obligated itself to insure the safe arrival of the barge at her port of destination. In the absence of such an insurance or guaranty, the respondent was required to exercise or-

dinary care only in the prosecution of the voyage, and to provide the essential equipment to that end. The use of the words "special tug," in the letter in evidence proposing the agreement, implied merely a towing service by the tug for the barge; and, since libelant acquiesced in the use of the new tug Lutz, the presumption is warranted that she was regarded as seaworthy and amply equipped for the undertaking in ordinary weather.

[2] 2. The evidence shows that the new Lutz was of sufficient power, and was built and equipped to perform under normal weather conditions the task assigned to her. The doors to the tughouse, true enough, were not water-tight; they were not double, nor did they contain gaskets; but they were of the usual construction in tugs of her type in use on the Great Lakes and tributary waters. In view of the severity of the weather and the strain on her doors, it is not surprising that they did not wholly resist the flow of waters against them. The tug was not required to withstand every peril, nor to be capable of rescuing her tow in all weather. The Allie & Evie (D. C.) 24 Fed. 749.

3. It is claimed that the coal remaining in the tug's bunkers was insufficient for completing the trip, and that on that account the tug quitted the barge; but this claim is not sustained. The established weather conditions and the evidence of Capt. Ryan show that there existed just grounds for fearing that the water in the fire hold would prevent the fireman from clearing the fires and keeping up steam in the boilers.

[3] 4. It was not practicable for the tug with tow to return to Port Dalhousie, since the wind did not portend danger until after she had left the anchorage of Main Duck Island, and had she then ventured to turn back she would have had to go against the wind, a hazardous expedient, while in continuing on her course she was going away from it. Hence it is not believed that fault is attributable to the tug for her failure to turn back, or for continuing on her course away from Main Duck Island.

5. There was conflicting testimony as to whether the tug failed to allow sufficiently for leeway in view of the storm; but the testimony of both Capt. Ryan of the tug and Capt. Sohrensen of the barge is in apparent accord with regard to the proper heading of the tug directly on Grenadier Island (and not farther south on Fox Island) soon after leaving Main Duck Island, and continuing until she changed her course, which brought the wind slightly over her port quarter. The witness Henderson, who was plowing on the south shore of Grenadier Island, testified that he observed that the tug was heading in the direction of Fox Island (out of her course); but I think he was mistaken, and did not correctly perceive her direction.

6. The tug could not safely seek refuge at Sackett's Harbor, as libelant contended that she should have done, because of the increasing velocity of the wind, which came nearly astern right after the tow left Main Duck Island.

There is abundant evidence to show that the situation owing to the severity of the storm, was fraught with peril to both vessels, and

that no blame can justly be attributed to the master of the tug for leaving the barge after signaling her to drop anchor in what he considered was a reasonably safe place. He was a competent pilot, and, even though under the circumstances he erred in leaving the vessel in his charge, his reasons for doing so, according to the proof, were based on substantial grounds, and the propriety of his action, as said in The James P. Donaldson (D. C.) 19 Fed. 264, must not be determined by the result. That the gale at the time the tow was abandoned was regarded as unprecedented was testified to, not only by witnesses who participated in the enterprise, but also by disinterested observers of weather conditions at Cape Vincent, not far distant (about 8 miles) from where the barge was left. The various allegations of negligence have been carefully examined by me, but in my opinion the evidence as to each and every one preponderatingly exonerates the tug and her master from fault for the mishap.

The libel is dismissed, with costs.