## STANDARD TRANSP. CO. v. GREAT LAKES TOWING CO.

(Circuit Court of Appeals, Second Circuit. November 10, 1920.)

### No. 39.

**Towage ⊕=11(10)—Tug not liable for injury of tow in gale.**

A towing tug *held* not liable for injuries to a barge, which drifted after she was directed by the tug to anchor during a gale on Lake Ontario, until she lost one anchor and went ashore, under the rule that the tug was bound to only ordinary care and skill, there being no evidence of fault in navigation, and the anchoring of the barge, if an error, being one of judgment of the master of the tug.

Appeal from the District Court of the United States for the Western District of New York.

Suit in admiralty by the Standard Transportation Company against the Great Lakes Towing Company. Decree for respondent, and libelant appeals. Affirmed.

For opinion below, see 260 Fed. 327.

Duncan & Mount, of New York City (Oscar D. Duncan, Courtland Palmer, and W. C. Pyne, all of New York City, of counsel), for appellant.

Kelley & Cottrell, of Cleveland, Ohio (G. W. Cottrell, of Cleveland, Ohio, of counsel), for appellee.

Before WARD, ROGERS, and MANTON, Circuit Judges.

WARD, Circuit Judge. The libel claims damages for injuries to barge S. T. Co. No. 82, sustained while in tow of the tug T. C. Lutz under an absolute contract to tow the barge safely from Cleveland, Ohio, to Montreal, Canada, in the month of November, 1916. The contract was evidenced by correspondence, which contains nothing whatever to vary the implied obligations of the tug, except the phrase occurring in the libelant's first inquiry of September 12, 1916, "What would be the rate for towing barge with a special tug?" The Tow-

ing Company answered, "$1,800, plus harbor tow in Cleveland," which was afterwards changed to $1,800, without harbor tow. If the contract be held to require a special tug, what does "special" mean? The Towing Company furnished the best tug it had, and one of the best on the Lakes. She was a new steel tug, substantially built, and abundantly supplied with coal, and we think was such a tug as conformed to the description. The doors of the fire room might have been constructed so as to be more watertight, but the mere fact that a vessel succumbs in extraordinary weather does not prove her to be unseaworthy.

The liability of the Towing Company in respect to navigation is one implied by law, viz. to exercise ordinary care and skill in performing the service. There was nothing to indicate storm down to the time the tow arrived November 23d at 4 p. m. at Main Duck Island, which is about 16 miles from the Narrows at the mouth of the St. Lawrence river. The lake voyage was then nearly completed, but the master concluded that it would be best to anchor there for the night, because it was getting dark and the weather foggy. The wind was light from the south, but during the night it shifted to the southwest, and at 7 a. m., with the wind light from that direction and the weather clear, the tow started out again. The southwest wind was a fair wind on the tow's port quarter until 8:30, when they had made 8 or 9 miles. There the tug hauled a little more to the northward, which is the proper course to enter the Narrows. Then the wind began to blow harder, more to the westward, and therefore more abeam, and the tow drifted with its long heavy towing chain cable off the starboard quarter of the tug.

Under ordinary circumstances the tow would have made the Narrows in about an hour, but the wind increased in the estimation of the witnesses to from 70 to 75 miles an hour—a hurricane from the west. When the tug was heading on her course for the Narrows, the tow would swing over to leeward, and with her heavy towing cable would pull down the tug's starboard side, so that the water entered the fire room through the fire room doors. Then the tug would head into the wind, so as to give the firemen an opportunity to get the water out of the fire room, and, though the barge would then lie astern, the tug could make no headway. After struggling for some two hours, the tug signaled the barge at about 10:30 a. m. to let go her anchors, which she did in 3½ fathoms of water, heading to the west into the wind and tailing towards Grenadier Island at a point about 1½ miles west of the island and about 4 miles south of the entrance to the Narrows. The tug, seeing that the anchors of the barge held her, then proceeded into the river; the barge being in sight for about an hour. The barge drifted astern, and finally her stern pounded on a shoal, and at about 1 o'clock the shackle which connected the ends of the port and starboard anchor chains broke, whereby the starboard anchor was lost and she went ashore.

The District Judge dismissed the libel. The evidence abundantly supports his conclusion that the master exercised the ordinary judgment and skill which the law imposes on him throughout the trip.

The appellant contends that the claimant's defense is inevitable accident, and that therefore it must show that no negligence whatever contributed to it. That defense applies in actions against tort-feasors and against common carriers; they being insurers. The defense here is that the master of the tug exercised ordinary care and skill, and even if he were guilty of errors of judgment the owners would not be liable, which is the well-settled law.

It is said as a matter of navigation that, instead of holding on in the effort to enter the Narrows on a northeasterly course, the master should have turned about on a southeast course for Sacketts Harbor. This was a matter of judgment. Besides, a gale from the west three points forward of the starboard beam on a tow going southeast would be just as dangerous as such gale three points abaft the port beam to a tow going northeast, to which must be added the obvious danger of turning about with the tow on a long hawser in such weather.

The decree is affirmed.