**THE HACKENSACK. THE TRITON. PENNSYLVANIA COAL CO. v. POTTER TRANSP. CO.**

(District Court, S. D. New York. April 19, 1922.)

1. **Towage ⊛═▷11(10)—Tug held not in fault for injury to anchored tow.**

A tug, which left three barges of her tow overnight, anchored in what was then a sheltered position from the wind, which had been blowing from the east for some hours, *held* not in fault for injury to one of the barges, which dragged her anchor when the wind suddenly changed to northwest, blowing within five minutes after the change at the rate of more than 80 miles an hour.

2. **Towage ⊛═▷11(10)—Tugmaster not required to keep advised of weather signals at night in harbor.**

The master of a tug, who had left his tow anchored overnight in New York Harbor, where one of the boats suffered injury through a sudden change in the wind and a violent gale in the night, *held* not chargeable with negligence for not anticipating the storm, of which the weather signals gave no notice until after 8 o'clock.

In Admiralty. Suit by the Pennsylvania Coal Company, owner of the barge Hackensack, against the Potter Transportation Company, Inc., owner of the steam tug Triton. Decree for respondent.

Decree affirmed 291 Fed. 73.

Park & Mattison, of New York City (Anthony V. Lynch, Jr., of New York City, of counsel), for libelant.

Harrington, Bigham & Englar, of New York City (Fitz-Henry Smith, Jr., of Boston, Mass., of counsel), for respondent.

KNOX, District Judge. Upon December 13, 1917, the steam tug Triton reached Whitestone from New Bedford, having in tow the barges Hackensack, Canisteo, Camden, and Sharon. Before passing through the Gate, the barges were arranged in one tier, and in that fashion were towed to Red Hook Flats, arriving there at about 4 o'clock in the afternoon. The wind was blowing from the east and snow was falling.

The Canisteo, Camden, and Hackensack were anchored under the lee of Bay Ridge with the Hackensack's anchor; that boat being the larger and higher, and positioned between the two other barges. The tug then towed the Sharon to an anchorage at Robin's Reef, near which she was bound. The destination of the Hackensack was Edgewater, and when she was anchored at Red Hook the bargemaster asked the captain of the tug when he would be taken up the North River, and was answered that he (the tug captain) did not know.

---

⊛═▷For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Returning from the delivery of the Sharon, the tug passed by the anchored barges, and, as they appeared to be safely anchored, it was thought better to leave them as they were than to attempt to go up the river with the darkness of night at hand. The tug accordingly went on to the Shewan Dry Docks, Twenty-Seventh street, Brooklyn, where she was to undergo some engine room repairs.

When the Hackensack anchored, she put out a 2,700-pound anchor on 30 fathoms of chain. During the early part of the night the wind increased, and 15 more fathoms of chain were paid out. All went well until between 2 and 3 o'clock a. m. of December 14, when the wind suddenly veered to the northwest, and attained a maximum velocity of 92 miles an hour. Under the force of this wind the anchored barges began to pound against each other and the Hackensack to drag her anchor. Shortly thereafter the boats brought up against a bulkhead along the Brooklyn water front. The Hackensack suffered considerable damage from the pounding of the barges and from her collision with the bulkhead. For the injuries sustained it is now sought to hold the tug responsible.

Among the allegations of fault upon the part of the tug are: (1) That she was not in charge of a competent person. (2) Failure to single out the barges and anchor them separately. (3) Failure to exercise reasonable care in the anchorage of the barges, and leaving them improperly bunched and made fast in a heavy wind and sea.

In the answer certain faults are charged against the Hackensack, in that she did not, when the wind changed, take proper precautions, in conjunction with the Canisteo and Camden, to ride out the storm. These faults, I think, are not made out, in that one must start with the proposition that the storm, which broke in its fury in the harbor on the morning of December 14, 1917, was one of the six worst of which the local Weather Bureau has record since 1911. The barges did weather the wind and sea until the coming of the terrific blasts of wind in the early morning of the 14th, and when those in charge of the barges were roused by the storm and went on deck it was a hopeless task for them to get out additional anchors or to do anything else by way of protecting the boats. It was then all but impossible for the men to make their way along the decks. It is easy enough now to say that the bargemaster was inattentive to his duties, and that he did not do all that he should have done in the way of anchors and the like, but his alleged shortcoming does not appear so marked when it is remembered that, as the storm increased, the tug did not attempt to render assistance, but was much occupied in looking after her own lines at a wharf or pier. In my judgment, blame cannot properly be placed upon the Hackensack.

[1, 2] And now as to the tug: According to the testimony of Mr. Scarr, of the local weather station, the wind upon the afternoon of Thursday, December 13, blew from the northeast and east with a velocity ranging from 12 miles an hour at noon to 32 miles at midnight. The heaviest wind over this period was 36 miles. A storm warning that had been issued at 2:30 p. m., but which was delayed in transmission, was received at the weather station at 8 p. m. It predict-

ed "fresh to strong southeast winds, * * * becoming westerly early Friday morning." Appropriate warnings were hoisted on the Whitehall Building, and telephone messages were sent to such persons as have requested that service. The tugmaster and her owners seem not to be among that number.

At 11:30 p. m. another warning was received at the station. That indicated a severe storm over the New Jersey coast, moving northeast with strong westerly winds. That warning was given by navy wireless to the newspapers. From midnight of the 13th until after the time the Hackensack dragged her anchor the weather conditions, as described by Mr. Scarr, were as follows:

"The wind was steadily from the northeast, bearing a little east up to about 2:37 a. m. of the 14th, when the shift was abruptly around to northwest, through the west, and there was a period of much lighter wind. The last mile of wind that was made from the northeast or east was made at the rate of about 15 or 16 miles an hour, and then, in the next five minutes, it jumped up to a velocity of about 80 miles from the other direction, northwest, and continued for 40 or 45 minutes."

The maximum velocity in this period was 88 miles at 2:46 a. m. During the afternoon of the 13th the barometer fell steadily, receding from 30:27 inches at noon to 29:10 inches at 2:50 a. m. of the 14th. Mr. Scarr says that this indicated a very severe windstorm, probably beginning with an easterly wind and shifting to northwest. In regard to this it is to be observed that the Triton had a barometer, and upon the master being asked if, subsequent to anchoring the barges, he took note of the barometer or made inquiry as to predicted storms, he answered:

"I wasn't doing any towing. I was in the shop. * * * There was no reason I should make inquiries."

Returning to the testimony of Mr. Scarr, I find that he said that storms such as this—

"are not frequent, but they do occur. They do not occur every year. * * * There are two or three storms recording slightly higher wind velocities, but it is doubtful if *any storm could have experienced a quicker wind shift or a more violent outburst after the shift.*"

It was held in Nicholson v. Erie R. R. Co., 255 Fed. 54, 166 C. C. A. 382, to be the duty of tugmasters engaged in moving boats around New York Harbor to observe and give weight to Weather Bureau signals, and not doing so—

"constitutes some evidence of a failure in that ordinary care and skill which is a master mariner's duty."

But, in so far as any shortcomings of the Triton's master in this branch of the case contributed to the Hackensack's injury, it is to be said that any signals flown at the weather station prior to 8 p. m. of the 13th would not have foretold what came to pass. At that time the boats were in what seemed to be a safe place, and were easily riding out the wind, and it seems to me that it would be going a little far to say that throughout the night a tugmaster must keep in telephonic communication with the Weather Bureau in order to exercise the ordinary skill and care with which he is charged.

I feel, too, that any suggestion that the master should have taken heed of his barometer and accurately interpreted its action should not in this case work to the tug's disadvantage. The conditions which ensued the falling barometer were about the same over a period of 12 hours, and to hold that a tug is to be held responsible because she did not foresee that a not excessive wind that had prevailed for a number of hours should, inside of 5 minutes, change to the west and then blow an 88-mile gale, is too rigid a standard. To hold the tug to it would be little short of making her an insurer, and, of course, she has not that degree of responsibility. Kenny v. Cornell Steamboat Co. (C. C. A.) 271 Fed. 411.

The following facts also make for the exoneration of the tug: The evidence fairly establishes that Red Hook Flats constitute a good anchorage, even in a heavy easterly wind, being protected by the high Bay Ride shore, and that the manner in which the barges were anchored is not objectionable under such conditions as prevailed at the time the Hackensack dropped her anchor.

There are these additional circumstances, and they are not without weight: (a) That the barges Camden and Canisteo were operated by the claimant, and it exposed the Hackensack to no greater danger than it did the other boats; and (b) that upon the night in question other vessels got into trouble. In the neighborhood of the Hackensack two freight steamers and the barge Cohocton went ashore, presumably having dragged their anchors.

It is true that a tug must watch changes in weather while a tow is moored, and must go to its assistance when the changes render such action necessary, and the tug is not to be excused because the severity of the storm drove other boats upon the shore. The Thomas Purcell, Jr., 92 Fed. 406, 34 C. C. A. 419. But what, it may be asked, could the Triton have done here, when the change of weather responsible for the accident occurred in 5 minutes, and when it is considered that the fierceness of the storm made it practically impossible for men to stand against the wind?

Upon the facts of this case I am of opinion that the tugmaster's action is not one which nautical experience and good seamanship would condemn as unjustifiable at the time and under the circumstances shown, and that he should not be charged with negligence. Clarence Blakeslee, 243 Fed. 365, 156 C. C. A. 145.

The libel will be dismissed, with costs.