Krusen, Evans & Shaw, of Philadelphia, Pa., for libellant.

Robert G. Kelly, of Philadelphia, Pa., for Sheridan Transp. Co.

## THE BRILLIANT.

### No. 119 of 1944.

District Court, E. D. Pennsylvania.

Oct. 18, 1945.

Shields, Clark, Brown & McCown, of Philadelphia, Pa. (by William K. Given, Jr., of Philadelphia, Pa.), for Taylor & Anderson Towing & Lighterage Co.

WELSH, District Judge.

This action was brought to recover for damages to the tank barge Monessen while it was being towed through Chesapeake Bay by the tug Brilliant. From the evidence submitted, we make the following

### Findings of Fact

1. The libellant, Gulf Oil Corporation, is the owner of the barge Monessen. The Monessen is a steel tank barge 199.5' long, 36' wide, 8.5' draft, and of 682 gross tons. It has no motive power or rudder,

its deck is flat except for a crew house on the after-deck and a small pump house amidships, with 2' to 3' freeboard, and it was equipped with a 400 lb. anchor. It carried a cargo of 8500 barrels of fuel oil weighing approximately 1300 tons at the time of the accident involved.

2. The tug Brilliant is owned by D. T. Sheridan and is operated by Sheridan Transportation Company, as agent. It is a steel steam tug 78' long, 20.5' wide, 9' draft, 84 gross tons, 275 to 300 horsepower and is equipped with an anchor weighing about 200 pounds. The Brilliant had long been engaged in general towing, had towed other tank barges, and was adequate under normal conditions to undertake the tow of the Monessen.

3. In January, 1943, there was in effect an oral agreement under which the Respondent, Taylor and Anderson Towing and Lighterage Company, provided towing service for the libellant. When the libellant required towing service it telephoned to Taylor and Anderson and made known its requirements. Frequently tugs other than those owned by Taylor and Anderson were dispatched to perform the towing and were accepted by the libellant.

4. The Brilliant took the Monessen in tow at Girard Point at 11:00 p. m. on January 18, 1943, headed for Sparrow's Point, Maryland, pursuant to a request made by the libellant to Taylor and Anderson Towing and Lighterage Company, which Company caused the Brilliant to be dispatched for the tow instead of its own tug, in accordance with the existing custom.

5. The Brilliant was made fast to the port side of the Monessen by 5" manila bow and stern lines and a 6" manila tow or spring line, with the stern of the tug extending 12' to 15' beyond the stern of the barge.

6. The voyage down the Delaware through the Delaware and Chesapeake Canal and the Elk River was uneventful. The weather was calm with light to medium fog prevailing, and the barometer on the tug remained steady at 30.10. At about noon on January 19, 1943 while the vessels were near Turkey Point, below which the Elk River becomes part of Chesapeake Bay, Mate Hassell of the tug Brilliant relieved Captain Daisey, who retired to his quarters to rest after directing the Mate to call him in case of any change of weather.

7. At about 2:00 p. m. when the vessels had proceeded into the open waters of the bay some miles beyond Turkey Point, they were struck by a sudden and violent wind storm or squall, in which the wind blew at 40 to 50 miles per hour, followed by waves rising to 6' or 8' in height.

8. A few minutes after 2:00 p. m. the Mate called the Captain of the tug, who had then been partly awakened by the pounding of the tug against the barge. The weight of the barge precluded its rise and fall with the waves at the same rate as the lighter tug and the action of the waves was causing the tug to bump the side of the barge. The wind was from the northwest and caused the tug and tow to swing toward the right into the wind in spite of the efforts of the tug crew to hold its course. By reason thereof the tug was unable to control the barge.

9. The tug captain summoned the barge captain by whistle, told him that the tug was casting off, and directed the barge crew to throw over their anchor. The barge anchor was thrown overboard as directed and took hold, causing the bow of the barge to which the anchor cable was fastened to head into the wind.

10. After casting off, the tug turned and proceeded to safety up the Sassafras River, at about 2:10 p. m. Thereafter the Monessen drifted slowly toward the lee shore and stranded at about 3:00 p. m. on the beach between Betterton and Howell's Point. She remained there until about 5:00 p. m. on January 20, when she was pulled off by a Coast Guard cutter after being lightened by the removal of a portion of her cargo. At that time it was found that the anchor had broken midway in the shank, and the lower half with the flukes had been lost.

11. The damage to the barge was sustained after she had been cast off by the tug and stranded on the beach.

12. The Captain and crew of the tug were qualified by experience and training to handle the tug and tow, to make a reasonable estimate of the probable consequences of a severe storm upon the tug and tow, and to appreciate the existence and extent of the dangers of such storm.

13. The tug and its crew were in danger of capsizing due to the high wind and heavy seas if it had remained lashed to the barge or if it had undertaken to tow the barge by means of a stern line. The

tug was also in danger of damaging its plates, with the possibility of sinking, due to striking the steel edge of the barge as it rose and fell more violently than the heavier barge. After it had cast off the tug was wholly unable to render any aid or assistance to the barge or its crew.

14. The Captain of the tug had reason to believe that the barge would be able to ride out the storm in safety, inasmuch as it was anchored, and its flat deck would not retain the weight of the sea as it broke over the barge deck.

The evidence from which the above facts are found clearly shows that the Captain and the Mate of the tug were capable and conscientious in the performance of their duties and that they exercised sound judgment in casting off the tow in the manner described. Although inland waters are deemed less dangerous than the open sea, it is well recognized that the Chesapeake Bay can become extremely violent and hazardous to vessels intended for inland navigation such as those here involved. The sudden storm as described by the witnesses was unusual in its violence and more severe than the crews had reason to anticipate.

Good seamanship would require the master of a tug to not only preserve the property in his custody, but to preserve with even greater care the safety of his crew. The extremity with which Captain Daisey was faced has been vividly pictured by experienced seamen. He found himself in a situation which made necessary a choice between the possible loss or severe damage to the tug and its crew, or the abandonment of his normal duty to proceed with or stand by the tow. He chose the latter course, believing that the barge was better able to ride out the storm, and was justified in that belief by reason of the comparison of the vessels and the knowledge that the barge was anchored. The fact that the barge and its crew survived with relatively minor damage confirms his judgment, and it is quite possible that no damage whatever would have been sustained if the anchor had not broken. Even if the anchor were inadequate in weight it could be expected to at least retard the drift to the extent that no damage would be suffered.

Under the circumstances we could not in good conscience condemn the actions of Captain Daisey as negligent, or conclude that in exercising his sound discretion in the face of danger he had breached any legal duty to the libellant.

## Conclusions of Law

1. The libellant has failed to establish a contract with the respondent, Taylor and Anderson Towing and Lighterage Company, to undertake the towage on the voyage involved in this case and there is no evidence from which to find that Taylor and Anderson were responsible or liable for the damage sustained in the course of that voyage.

2. The libel is dismissed as to the respondent, Taylor and Anderson Towing and Lighterage Company.

3. The respondents, tugboat Brilliant, D. T. Sheridan and Sheridan Transportation Company, discharged their duty to the libellant to furnish a seaworthy tug to tow the barge Monessen on January 18, 1943 from Girard Point, Philadelphia to Sparrow's Point, Maryland. The Brilliant had sufficient power and adequate equipment to perform such service in normal weather conditions and was not obligated to withstand all of the perils of the sea nor to control its tow in unusually extreme weather.

4. Due to the violence of the storm the tug Brilliant was in danger of capsizing or sinking as the result of being pounded against the sides of the barge and its crew were in danger of losing their lives. The Captain of the tug exercised sound discretion and was not negligent in abandoning the barge.

5. The tug crew was not negligent in failing to stand by the barge after it had been cast adrift because it was impotent under the circumstances to render any assistance to the barge and would have been in further danger had it attempted to stand by.

6. The Captain of the tug Brilliant had reason to believe that the barge would suffer no damage by reason of being anchored although exposed to the stormy waters of the Chesapeake.

7. The libellant has failed to establish any liability for the damages either civil or maritime against the respondents, the tugboat Brilliant, D. T. Sheridan and the Sheridan Transportation Company.

The libel is, therefore, dismissed, with costs to be taxed.