THE GRAEBNER.

THE HARRY R. CONNERS.

THE JALAPA.

No. 17054.

District Court, E. D. New York.
March 13, 1946.

Hagen & Eidenbach, of New York City (Chas. W. Hagen, of New York City, of counsel), for libellant.

Purdy & Lamb, of New York City (Edmund Lamb, of New York City, of counsel), for the Harry Conners.

Burlingham, Veeder, Clark & Hupper, of New York City (Eugene Underwood, of New York City, of counsel), for the Jalapa.

KENNEDY, District Judge.

On the morning of July 25, 1943, libellant's scow, H. C. Graebner, while moored alongside a sticklighter on the northerly shore of Kill van Kull, broke loose from her moorings and eventually sank. Libellant claims the responsibility for the disaster is upon either the steamtug Harry R. Conners, or the tank steamer Jalapa, or both; on the first, because of negligence in the performance of a towage contract, on the second because she negligently created swells while steaming out of the Arthur Kill, bound for sea.

For some ten years preceding January 4, 1943, libellant had a contract of towage with Conners Marine Co., Inc. On the date I mention a renewal contract was made. But the arrangement between libellant and the tower had not differed over that ten-year period. Conners was to pick up scows and barges loaded with traprock at 34th Street, North River, at a place called the Terminal (or Market). The tows would then be towed out of the North River on the first ebbtide succeeding notice, and thereafter it was the duty of Conners to "continuously tow them through to destination." Usually, and, in the instance at bar, the scows were to be towed to a point up Rahway River, which is navigable only by shallow-draft vessels. For this reason, it was not unusual for Conners to break the voyage. It was often found necessary to moor the loaded scows in the Kill van Kull or in Arthur Kill, in order to await the top of the flood tide at Rahway River during daylight hours.

In the case at bar, the tug Harry R. Conners, which is 95 feet long and draws approximately 10 feet, 8 inches of water, picked up H. C. Graebner at the terminal at 8:00 p. m. on Saturday, July 24, 1943.

This put the tug and tow in the Kills at about 11:00 p. m. The tide was ebb, the weather clear, and the wind negligible.

Having arrived in the vicinity of Elizabethport, the tug, pursuant to its instructions, moored the scow and put back to Port Richmond for further orders.

It is necessary for me to describe in some detail the berth which the tug gave the scow. Elizabeth River flows in a southerly and easterly direction and empties into Arthur Kill. Adjacent to its mouth are a number of shore structures.[1] Immediately to the south of the point on the Jersey shore where the Elizabeth River joins the Kill, is a marine railway. At this point the dredged channel is not quite 200 yards wide. On the evening of July 24, 1943, an old sticklighter was moored alongside the marine railway bulkhead with her bow about 50 feet from the northeast corner. It was here that Harry R. Conners elected to moor libellant's scow. Having rounded to in the Kill, the tug put H. C. Graebner port side to alongside the sticklighter with lines at bow and stern. The sticklighter herself had four lines out to the bulkhead. One, trending forward, ran from a wooden bitt on her port bow corner to an iron bitt on the bulkhead. A breast line ran from a bitt on the center line of the sticklighter's bow to the bulkhead. At the stern the sticklighter was secured to some sort of pole on the bulkhead, with lines running from the after corners.

This was certainly a curious place to moor a scow laden with cargo. In the first place, it is very doubtful that anyone ever intended that vessels should be berthed at the bulkhead, at least in the ordinary sense of the term. The sticklighter was undergoing repairs and her presence there was perfectly understandable. But, as I have said, at this point the Kill is scarcely 200 yards wide, and even if the sticklighter's beam was only 30 feet, she and H. C. Graebner, lying side by side, would use up 60 feet. Moreover, the channel through Arthur Kill is deeper on the Jersey side than it is on the Staten Island side and therefore more frequently used. Beyond

---

[1] See Jalapa Exhibit 3.

all this, the evidence is ample that not only the sticklighter but the marine railway itself, were both in a sad state of disrepair.

The record makes it clear that the only reason that Harry R. Conners selected this berth was because she had been refused access to better ones at Elizabethport. Still better berths were available at Carteret, but since the tug intended to tie up for the night at Port Richmond, to use these would have meant a long trip down Arthur Kill and back again.

The scow lay at her berth during the night of July 24, 1943, and the early morning of July 25, 1943, without incident. The bargee was aboard. But there was no heavy traffic in the Kills. There was scarcely any wind, and the effects of the changing tide would be negligible. At 7:30 a. m. on the morning of July 25, 1943, S. S. Jalapa was making ready for sea. She is a tank steamer 523 feet long; her beam is 68 feet, 2 inches, and she is streamlined at bow and stern. On the morning in question, her draft forward was 22 feet, 7 inches, and aft 23 feet, 3 inches. She was moored at Bayway, about one mile south of H. C. Graebner's berth, and her intention was to proceed northerly up Arthur Kill, into Kill van Kull, then into the lower bay. The tide was ebb, and the Jalapa was warped away from her berth with the aid of two Card tugs. By 7:38 she had been turned around, so that her bow was headed north. She was then going ahead slow on her engines. Everything in the case indicates that she never increased her speed until 7:55, and at that time she was opposite Elizabethport Recreation Pier, well past H. C. Graebner's berth. By that time the scow and sticklighter had broken adrift, the lighter's port bow bitt having pulled out.

The scow's bargee heard Jalapa blow for the draw a half mile to the south of H. C. Graebner's berth. At that time and until she was well past the scow, Jalapa was certainly not making much more than 4½ knots through the water. The evidence indicates that this speed is barely sufficient to give her steerage way. She had a tug on either side.

Certainly when the bargee of H. C. Graebner watched the Jalapa approach he did not become alarmed, and his evidence cannot be read to mean that the Jalapa was causing any considerable swells.

█ Jalapa was in the middle of the channel. There is nothing to sustain the suggestion that her speed was excessive. And expert evidence called in her behalf is pursuasive on the point that under the conditions neither her bow wave nor her quickwater caused any disturbance of the Kill that was excessive, or could even be called unusual. I have no choice therefore, except to acquit her.

█ This leaves only the claim of fault on the part of the tug in berthing H. C. Graebner where she did. There was lively debate in the case about how far the duty of a tug extends in cases like this. On the one side it was urged that having seen her tow made fast in apparent safety, a tug can go where she likes; from that point on she is no longer chargeable. To hold otherwise, it is said, would mean that no tug could ever moor a scow unless she had time to remain at the berth and act as a sentinel. On the other side, it is suggested that having accepted a contract of towage a tug which leaves her charge exposed to peril cannot escape liability. I do not think it is necessary to consider these extremes in dealing with this case. Certainly since Stevens v. The White City, 1932, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699, it has been clear that in towage cases, the inquiry is whether the tower was guilty of negligence, and whether that negligence was the proximate cause of the damage sought to be recovered. And of course, it is true, that even a negligent tug can escape the consequences, where she sustains the burden of proof upon her to demonstrate that some intervening cause for which she was not responsible brought about the disaster. The Bartle Daly, 2 Cir., 1930, 45 F.2d 605, 607. This amounts to no more than saying that the tug can avoid liability if her own negligence was not really the proximate cause of the damage.

█ I have no difficulty in finding that the tug here was negligent. The berth was bad—I doubt whether it should even be dignified by the name of berth. The tug was plying those waters, and those in

charge obviously knew the risks that were being run. From the time H. C. Graebner broke loose from her mooring on the morning of July 25, 1943, until she slid off into deep water on the following morning the tug's negligence had set in motion but one unbroken chain of causation.

There was nothing the bargee could do to mend the situation. It is of course, quite likely that when H. C. Graebner swung around on her stern line she got a hole in her stern from some obstruction underneath the water at the marine railway bulkhead. But that was part of the risk the tug accepted in selecting such a mooring place. I do not mean to say that a tug ought to be charged with defects in a berth which she does not and could not know about. I mean that H. C. Graebner was moored in a spot where she should not have been at all.

All this leads me to conclude that the tug Harry R. Conners is solely at fault and that libellant is entitled to an appropriate decree. Jalapa is of course entitled to a dismissal. I have filed findings of facts and conclusions of law.