ALLIED CHEMICAL & DYE CORPORA-
TION, as Owner of THE Barge BAR-
RETT NO. 1, Libelant,

v.

THE Tug CHRISTINE MORAN, THE
Tug CLAIRE A. MORAN, INC.,
Claimants,

and

Moran Towing & Transportation Com-
pany, Inc., and Seaboard Shipping
Corporation, Respondents.

United States District Court
S. D. New York.

Jan. 23, 1961.

Pyne, Smith & Wilson, New York City, for libelant. William G. Wilson, Staten Island, N. Y., Albert Robin, Edmund S. Purves, New York City, of counsel.

Burlingham, Hupper & Kennedy, New York City, for claimants and respondents. Eugene Underwood, Robert A. Feltner, New York City, of counsel.

DAWSON, District Judge.

Allied Chemical & Dye Corporation, as owner of the barge Barrett No. 1, filed a libel against the tug Christine Moran, Moran Towing & Transportation Company, Inc., and Seaboard Shipping Corporation, based on breach of contract and negligent towage. This *in rem* action against the Christine Moran and *in personam* action against Moran Towing & Transportation Company, Inc. (hereinafter referred to as "Moran") and Seaboard Shipping Corporation (hereinafter referred to as "Seaboard") was tried under the admiralty jurisdiction of this Court.

### The Parties

Libellant, Allied Chemical & Dye Corporation (hereinafter referred to as "Allied") is a corporation duly organized and existing under the laws of the State of New York with an office and place of business in the City of New York. At all times pertinent to this case the barge Barrett No. 1 was owned by Allied.

Respondent Moran is a corporation organized and existing under the laws of the State of New York, having a place of business in the City of New York. At all times pertinent to this cause of action, Moran owned and operated the tug Christine Moran, which is within the jurisdiction of this Court.

Respondent Seaboard is a corporation organized and existing under the laws of the State of Delaware, having a place of business in the City of New York. Pursuant to a contract dated January 19, 1954, the barge Barrett No. 1 was time

chartered by libellant to Seaboard. This charter was in force and effect at all times pertinent to the present cause of action. Under the terms of the agreement, Allied, as owner of Barrett No. 1, undertook to maintain, equip and supply the vessel. The Barrett was to be properly manned by a captain and crew provided and paid by Allied. Throughout the period of this charter, the barge was manned, operated and controlled by employees of Allied.

On or before December 4, 1954, Seaboard engaged Moran to tow the Barrett No. 1 from Morehead City, North Carolina, to New York City. Pursuant to this agreement, Moran assigned the tug Christine Moran to perform the towage service.

### The Facts

The barge Barrett No. 1 (hereinafter referred to as "Barrett") has a steel hull, is 228 feet long, 38 feet wide and 16.8 feet deep. She is equipped with two stockless anchors, weighing 1,200 pounds each, each anchor having 75 fathoms of 1⅛th inch chain. The Barrett is also equipped with ballasting facilities and a sea cock. In addition the Barrett has a boiler to heat cargo, three primary diesel engines to pump cargo or ballast and generate electricity for light. The Barrett has no steering apparatus. She has no motive power or radio transmitter, nor is she equipped with any mechanical signalling device.

When she left Morehead City, the Barrett was entirely light except for 4,000 gallons of fuel oil, used to clean the tanks, and had a draft of 1' 6" forward and 5' 6" aft.

The Barrett's crew consisted of two tankermen, Captain Henry Slivinski and Mate Lars Midthassel, and two firemen, Norman Jorgensen and Henry Zines. Even though the captain and mate were certified able-bodied seamen, no one on board was skilled in navigation. Had there been navigational equipment aboard the vessel, it could not have been used by the crew. But this does not suggest negligence on the part of Allied in failing to equip or man the ship properly; for, in fact, the crew and equipment of the barge were well above the general standard in the industry. Where a barge is in tow of a tug, the tug is the "dominant mind" and the tow need not be manned as a separate entity seagoing vessel. See, Cleary Bros. v. The Dauntless, 2 Cir., 1949, 178 F.2d 72; The Rebecca, 4 Cir., 1945, 152 F.2d 607.

The tug Christine Moran is 96.3 feet long, 25.2 feet wide, and 10.8 feet deep, built in 1953, with 1,000 horsepower diesel-electric engine. She carried a competent crew of nine.

About noon of December 5, 1954, the day after the tug and tow set sail for New York, the Christine's master, Captain Anderson, learned of an unfavorable weather forecast. He thereupon altered course off Cape Henry, Virginia, and headed into Hampton Roads.

At 4:40 P.M. the Christine ordered the Barrett to drop anchor. The port anchor was let go and 2½ shackles (37½ fathoms or 225 feet) of chain were paid out. The vessels, at this time, were somewhat north of Craney Island in Hampton Roads.

The Christine then made fast alongside the Barrett and both vessels awaited the 6:00 P.M. weather report.

At 6:00 P.M. the Christine's master learned that northeast storm warnings had been hoisted at 5 o'clock. Increasing northeast winds, becoming strong early in the night, probably reaching gale force (39–54 mph) at times late that night or the next day, with rain or snow and poor visibility were forecast.

The Christine's captain advised Captain Slivinski of the forecast, suggested that he let out more anchor chain, and told Slivinski that he had decided to leave the barge where she was at anchor, while the Christine made her way to port in Norfolk Harbor.

At 6:15 the Christine left the anchorage and proceeded to Curtis Bay Towing Company dock at a distance of one hour and five minutes away. The Christine stayed at that dock until about noon of

December 6, 1954, at which time it returned to the anchorage to find that the Barrett had gone aground during the storm.

The Barrett crew remained aboard after the Christine left at 6:15 P.M. on December 5th. Anchor lights and watches were set. At 8:00 P.M. an additional 1½ shackles of anchor chain were let out. The Barrett's log book reveals that at 8:00 P.M., 11:00 P.M. and midnight the crew believed the anchor to be holding. The anchor chain was felt and cross range bearings and soundings were taken.

The weather remained clear and calm until 11:00 P.M. Sometime before midnight the winds increased and it began to rain and snow. As the night progressed the weather worsened. The winds reached gale force. Visibility was very poor.

The following was entered in the log book between 12:00 and 4:15 A.M.:

"Heavy snow—visibility very poor —cannot see shore, other ships, or any lights."

By 4:15 A.M. a ship was sighted, anchored approximately 1,000 feet away. About 4:30 A.M. trees were sighted on shore. By 4:45 A.M. the tow was dragging anchor in shallow water 150 feet off shore. At 5:00 A.M. the Barrett was aground on Craney Island.

During the time the Barrett was at anchor, no efforts were made to ballast the vessel or to drop the second anchor.

## The Law

■■ What is the duty of a tug to a tow? The tug is considered the dominant mind in the tug-tow flotilla. Cleary Bros. v. The Dauntless, supra; The Rebecca, supra. The tow is, of course, responsible for the "internal economy" of the vessel, e. g., the shifting of lines when moored or anchored, the taking in or the letting out of hawsers with the variations in the tide. Tucker v. Reading Co., 2 Cir., 1942, 127 F.2d 527. This duty is strictly limited, however, because of the " 'feckless folk' who frequently

man barges." The B. B. No. 21, 2 Cir., 1931, 54 F.2d 532, 534.

[4, 5] A tug accepts responsibility for the tow as soon as it takes the tow from its originating berth. This is a continuing responsibility which does not terminate until the tow is safely anchored at the completion of the voyage. The Anna O'Boyle, 2 Cir., 1941, 122 F.2d 286, 287; The Baltimore, D.C.E.D.N.Y.1944, 53 F.Supp. 462, 464. When a tug finds that she cannot deliver her tow at the specified destination point, it is her duty to tie the tow at some safe place and protect it until she can make delivery at the specified point. The B. B. No. 21, supra; The May McGuirl, 2 Cir., 1919, 256 F. 20.

■■ Although this is a broad responsibility, the tug is not liable for damage in the absence of negligence. And that negligence must be the proximate cause of the injury, before any liability can be imposed on the tug. Stevens v. The White City, 1932, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699; The Graebner, D.C.E.D.N.Y.1946, 66 F.Supp. 456.

■ Thus the tug is not an insurer of the safety of the tow; nor does the tug assume the obligations of a common carrier. Southgate v. Eastern Transp. Co., 4 Cir., 1927, 21 F.2d 47, 49. Whether it incurs the duty of a bailee for hire may vary from case to case. Cf., Doherty v. Pennsylvania R. Co., 2 Cir., 1920, 269 F. 959, 962 with C. F. Harms Co. v. Erie R. Co., 2 Cir., 1948, 167 F.2d 562. But a towage contract does not *per se* give rise to a bailor-bailee relationship. Stevens v. The White City, supra; Petition of Tracy, D.C.S.D.N.Y. 1950, 92 F.Supp. 706, 712.

■ However, a tug is charged with the duty of exercising reasonable and ordinary care for the protection of its tow. Petition of Tracy, supra. Pursuant to this duty it should omit nothing which could reasonably be required to lessen the hazard to the tow. The tug must fulfill her contract with the degree of caution and skill prudent navigators usually employ in similar services.

Southgate v. Eastern Transp. Co., supra; The Hackensack, D.C.S.D.N.Y. 1922, 291 F. 69.

A tug also has certain duties which arise when it chooses to anchor or moor the tow prior to the termination of the towage contract. Where, for convenience, a voyage is divided into stages, the tug must provide the tow with a safe berth and she remains responsible for the moored tow during that period. The Printer, 9 Cir., 1908, 164 F. 314; Hughes v. Pennsylvania R. Co., D.C.S.D. N.Y.1899, 93 F. 510; The O. L. Halenbeck, D.C.S.D.N.Y.1901, 110 F. 556.

" * * * Even if the tug be justified in first cutting loose in order to take off the men as a proper precaution, this is no justification for thereupon abandoning the tow, without any reasonable investigation or inquiry into its condition, or any further attempt made to save it during the considerable period available for doing so. The tug is, therefore, answerable for the loss unless she shows that any further endeavors to continue towing would certainly have been useless, which she has not shown, and could not possibly show." 110 F. 559–560.

In Brown v. Cornell Steamboat Co., D.C.S.D.N.Y.1901, 110 F. 780, a scow in tow by a tug was anchored in the face of unpromising weather during the voyage. The tow was to resume operations the next day. There were no indications of a storm of great severity. However, in the course of the evening, the weather worsened and the scow finally broke loose. The court held that once the weather worsened, making it hazardous for the boat to remain in that place overnight, it was the duty of the tug to return in order to see that the tow was prepared for the change in weather, and, if not, to render whatever aid possible.

In Doherty v. Pennsylvania R. Co., supra, the respondent was to tow the barge Hercules from New York to South Amboy and back to New York. Due to weather conditions the tug tied Hercules at the Stakes, where rough seas caused it to pound against other boats in the area. Libellant contended that the tug left Hercules unprotected and pounding in the heavy sea and waves. Respondent countered that they had provided the usual mooring which was safe at the time moored. The tug was held negligent in leaving the Hercules at the Stakes, with knowledge of an approaching storm and in failing to return to the mooring place to aid or remove the Hercules.

A tug will not be held responsible for damage to its tow, however, even though it has cast off its tow, where such casting off is the result of a peril which could not reasonably have been anticipated, Standard Transp. Co. v. Great Lakes Towing Co., 2 Cir., 1920, 270 F. 215, affirming D.C.W.D.N.Y.1919, 260 F. 327; Eastern Tar Products Corp. v. Chesapeake Oil Transport Co., 4 Cir., 1939, 101 F.2d 30; where the casting off was necessitated by imminent danger to the tug, The Brilliant, D.C.E.D.Pa.1945, 64 F.Supp. 612; and where the tug was in fact powerless to render assistance to the tow, Southgate v. Eastern Transp. Co., 4 Cir., 1927, 21 F.2d 47. Where the reverse of this situation is true, the tug will be held responsible for damage to its charge. Cf., Tucker v. Reading Co., 2 Cir., 1942, 127 F.2d 527.

In the present case the Christine in fact did know of the storm and could reasonably have anticipated its severity. It awaited the weather forecast and had full knowledge of the impending danger. The Christine was a tug of sufficient power that it could have aided the Barrett. This it could have done by towing the Barrett up and down in the anchorage area, or by patrolling the area in order to move the Barrett further from shore should it begin dragging shoreward. It might also have moved the Barrett to some other place if it found that the anchorage area first chosen was too dangerous. All of this could have been done without seriously endangering the safety of the tug.

The Christine had a continuing duty to care for and protect or render assistance to the Barrett. This duty was not terminated or suspended when the Barrett was anchored. In failing to return to aid the barge when it knew of the dangerous conditions, the Christine breached that duty. In failing to care for her charge with reasonable prudence, the Christine was negligent.

## Was the Barrett Negligent?

The respondents urge that the Christine performed all its duties and that the proximate cause of damage to the Barrett, caused by her grounding, was negligence on the part of the crew of the barge. The respondents urge that the Barrett should have either taken on more ballast, or it should have put out its other anchor, or both. There was no proof that either ballasting or the other anchor would have prevented the grounding of the Barrett. At the most the Court is asked to conjecture that such would have been the result.

We are faced here with the situation of a tug which abandoned its tow in the face of an oncoming storm and left it without that supervision and protection which the tug, as the "dominant mind," should have afforded it. If it would have been desirable to ballast the barge, certainly it would be expected that the tug would be the one to give this order—and it gave no such order.

Likewise, the tug gave no order to put out the other anchor. The most that can be said is that the captain of the tug, before leaving the tow, told the captain of the barge that "he should pay out more chain and it could be advisable that he put the other anchor over." The testimony was that at 8:00 o'clock that evening the barge let out an additional 1½ shackles, making 350 feet of chain which was let out. The barge apparently did not know that it was dragging its anchor. Maybe competent seamen would have been able to detect that fact by soundings or observations, but it is not expected that a dead barge under tow should be manned by seamen capable of such exercise of judgment. In any event, they did not know they were dragging the anchor until shortly before the barge grounded. It may be conjectured that putting out another anchor would have delayed the drifting of the barge but no such definite conclusion can be drawn from the record before the Court. If another anchor was needed to keep the barge from disaster, it was the duty of the tug to see that the other anchor was put out.

The Court concludes that the proximate cause of the damage to the Barrett was the fault of the Christine and not the fault of the crew of the barge. It is well established that the burden of proof of intervening negligence rests with the respondent. P. Dougherty Co. v. United States, D.C.S.D. N.Y.1951, 104 F.Supp. 711, 716; The Anna O'Boyle, 2 Cir., 1941, 122 F.2d 286, 288; The B. B. No. 21, 2 Cir., 1931, 54 F.2d 532, 534. This burden has not been borne by respondents in the present action.

## Conclusion

Where a time chartered tow is damaged due to the negligence of a tug, the owner of the tow may proceed *in personam* against the charterer and the owner of the tug, and *in rem* against the tug. Todd Shipyards Corp. v. Moran Towing & Transp. Co., D.C.E.D.N.Y. 1956, 140 F.Supp. 107, affirmed 2 Cir., 1957, 247 F.2d 626; Jersey City Dry Docks Co. v. O'Brien Bros., Inc., D.C.E. D.N.Y.1943, 51 F.Supp. 958. See, In re Reichert Towing Line, 2 Cir., 1918, 251 F. 214. See generally, 86 C.J.S. Telegraphs, Telephones, Radio and Television § 81 (1954 & Supp.1960).

It is the finding of the Court that the tug Christine Moran is liable *in rem* for all damages sustained by the barge Barrett No. 1 and her owner, Allied Chemical & Dye Corporation, resulting from the grounding on December 5, 1954. The respondent Moran Towing & Transportation Co., Inc., by reason of the fault of the tug Christine Moran which it operated, controlled and navigated, is simi-

larly liable. Seaboard Shipping Corporation, as time charterer of the Barrett No. 1, is secondarily liable. The issue of damages shall be referred to a Commissioner for the assessment of the damages. The Commissioner shall thereafter report to the Court.

Submit decree in accordance with the above findings and conclusions.

This opinion shall constitute the findings of fact and the conclusions of law of this Court.