## NEW JERSEY SHIPBUILDING & DREDGING CO. v. TRACY TOWING LINE.

### THE MILDRED.
### THE MARGARET.
### THE THOMAS F. KEANE.
### THE MICHAEL TRACY.

District Court, E. D. New York.
March 4, 1930.

Alexander & Ash, of New York City (Edward Ash, of New York City, of counsel), for libelant.

Rumsey & Morgan, of New York City (J. T. Carpenter, of New York City, of counsel), for The Margaret.

Merrill, Rogers, Gifford & Woody, of New York City (William F. Shepard, of New York City, of counsel), for the Thomas F. Keane.

Macklin, Brown, Lenahan & Speer, of New York City (R. F. Lenahan, of New York City, of counsel), for The Tracy Towing Line.

INCH, District Judge.

Libelant, the owner of a dredge and a dumper scow, sued the coal barges Mildred, Margaret, and Keane and the tug Tracy and the latter's owner, the Tracy Towing Line, Inc., to recover damages arising from collisions between the scow and the barge Mildred, the dredge and the barges Keane and Margaret. No one seems to have appeared for the Mildred.

There was a previous suit and counter suit in the Southern District between owners of other vessels and the Mildred, Keane, and tug Tracy which brought out many of the same facts as in the present suit and resulted in a decree by Judge Coleman, 42 F.(2d) 1003, holding the tug Tracy solely responsible for the damage there found.

These suits were, however, between different parties than here. They also referred to a collision that occurred subsequent to the collisions here complained of. The proximate cause of same was found by Judge Coleman, and this would appear to be the same as is now claimed in this suit, to wit, the negligence of the tug Tracy. Both this suit and these other suits were questions of fact. While I am not aware of the proof in the other cases, except as indicated in the opinion of Judge Coleman, it is apparent that there has been testimony offered here by some of the claimants which was not offered in the other suits.

Therefore I cannot agree with libelant, who apparently argues that this previous decision in these other cases might relieve this court from careful consideration of all the present testimony. The well-known rule, Commercial Union v. Anglo Bank (C. C. A.) 10 F.(2d) 937, does not apply. Here the suit is between different parties. The accident was a different accident. The findings of fact here must rest on different and new testimony. The distinction is recognized under such conditions even as to questions of law. Mast, Foos & Co. v. Stover Co., 177 U. S. 485, 20 S. Ct. 708, 44 L. Ed. 856.

In any event, it is not a question of res judicata, but at most stare decisis. 34 C. J. § 1157. Southern R. Co. v. Clift, 260 U. S. 316–319, 43 S. Ct. 126, 67 L. Ed. 283, and likewise any law applied must depend on new findings of fact.

However, therefore, I may agree with the decision of Judge Coleman, I must consider all the testimony now introduced before me, particularly in view of the new testimony, and find the facts as this record alone before me indicates.

Accordingly, I find that about 9 o'clock on the night of February 16, 1926, there lay off the bulkhead dock of the Concord Coal Company, at about Seventy-Sixth street, East River, a flotilla of 10 barges. Some of them were loaded; some were light. This is an exceedingly narrow part of the East River. The tides, especially the flood tide, run exceedingly strong at this point, a circumstance well known to all competent tug captains. Joyce, the captain of the tug Tracy, testified, "That is where you get the full strength of the tide." The night was clear. A northwest wind of about an average of 30 miles an hour had been and was blowing. This flotilla was arranged in three tiers, of three boats in the front and rear tiers, while the middle tier had four boats.

It is as to this middle tier that we are solely interested.

This middle tier consisted of the following four boats, named in their order from the bulkhead, out into the river. The Bright Star, apparently loaded, was next to the bulkhead, then came the Mildred, a loaded boat, then the Margaret, a light boat, and finally the Keane, another light boat. The Keane was shorter and lower than her neighbor, the Margaret. It was impossible therefore for the master of the Keane to run any lines from his boat over to the bulkhead. Keane testifies: "If I had been alongside the loaded boats I could have managed to put lines out some way (to the dock) because they were lower than my boat."

This fact is both reasonable and probable and should not be overlooked in considering the duty of both this master and those of the tug Tracy which placed the Keane where she was.

The absence of anchors on some of these barges is immaterial in this case, as the proof plainly shows that no anchor could or would have prevented the accident.

We can now turn to the location of the other boats involved in the collision.

These consisted of the dredge No. 9, and a dumper scow 20. They were in the Hell Gate, a little north of Negro Point (Libellant's Exhibit 1).

The dredge was 145 feet long, 44 feet wide. She was anchored by anchors at bow and stern and had three spuds in position. She was properly there under a contract with the government.

Along the starboard side of this dredge was the dumper scow 20. She was 120 feet long, 38 feet wide. The bow of this scow was about 10 feet forward of the bow of the dredge. The usual lines ran from the scow to the dredge.

All regulation lights on both of these vessels were burning.

There is nothing to indicate any fault whatever on the part of either.

Having located the various boats, we now come to the accident.

According to Hendrickson, captain of the No. 9, about 9:30 that night, a drifting, loaded barge, which proved to be the Mildred, came up with the flood tide and collided with and sunk the dumper scow 20. The lines from the scow to the dredge were broken. The Mildred then continued "to drift up the river."

Shortly thereafter two more barges, the Keane and the Margaret, fast to each other, also drifted up and collided with the dredge, doing damage to that vessel.

Hendrickson testifies that: "The Keane was nearest to the dredge. The other (the Margaret) did not hit the dredge." These two barges stayed at the dredge until the tide turned and then drifted down the stream and away.

So far as the collisions are concerned, the proof shows that each of these three barges were helpless in the strong flood tide of Hell Gate and that there was nothing that could have been done to prevent them.

We must therefore search elsewhere, in order to fix the blame, if any, for the presence of these barges under such conditions.

The proximate cause is plainly discovered by proof of the careless manner in which the Keane had been tied up, by those in charge of the tug Tracy, to this middle tier of the flotilla already referred to.

 Those of the tug Tracy, among other careless acts, negligently overloaded this middle tier. The Herbert S. Keller (D. C.) 19 F.(2d) 527; The William Guinan Howard (C. C. A.) 252 F. 85; The Mary Ethel (D C.) 290 F. 458, affirmed (C. C. A.) 5 F.(2d) 1013.

This is shown by the following facts:

The flotilla, which then consisted of three tiers of three boats each, had lain, with apparent safety, for several days at the place in question. During the afternoon of February 16, and while it was ebb tide, the tug Tracy brought up the barge Keane to this flotilla.

The narrow river, with its swift tides, the wind, the danger of leaving a light boat, such as the Keane, sticking outside, exposed to the full force of these elements, should have been and were plainly apparent to those in charge of the tug.

The tug was in charge of the mate, Young. Her captain, Joyce, was present but he states he was off watch. I gather from his testimony that he is rather anxious to have this understood, for he testifies: "Young was in charge not me. It was under his direction that she (the Keane) was made fast."

Both Young, this mate, and Joyce, the captain, show that they knew that the Margaret "was higher than the Keane."

 The apparent danger therefore should have been duly considered by them, and due care used to see that the Keane did not endanger the flotilla, and was moored with reasonable safety. Cleary Bros. v. Port Reading R. Co. (C. C. A.) 29 F.(2d) 495.

Keane, the master of the Keane, saw the danger and protested. He says he didn't "want to lay outside the light boat." This protest was made when the mate of the Tracy first proceeded to tie up the Keane. Keane says he tried to stop the putting out of a line at first. However, the mate of the Tracy simply "pushed him up a little" opposite another light boat (the Margaret).

It is apparent that those in charge of the Tracy paid little attention either to the danger or the protests of Keane. The latter says: "I knew it was a bad place because it is a strong tide there. We were right out in the open. I made protest enough. He (the deckhand of the Tracy) had the line out before I knew it. I thought he was going to drop the light boat."

This last statement of Keane seems to be justified by what had occurred. The deck hand of the Tracy (who is not a witness, although efforts were made by counsel for Tracy to find him) had hurriedly put out a line from the bow cleat of the Keane to the off shore up river corner of the Margaret. He then told Keane to drop a line from the bow of his barge to the off shore corner of the outside boat in the tier just ahead.

It was this direction to put out a line to the tier immediately ahead which seems to me to indicate some justification for Keane's belief that this light boat was then to be taken out, which might have been done by subsequently dropping his bow line to the Margaret. This would have placed the Keane in a comparatively safe position alongside the loaded boat Mildred.

However, this deck hand and mate did nothing of the kind, but instead the Tracy immediately left the Keane in a position where all that Keane could do was to tie up the Margaret as safely as possible. Keane therefore proceeded to put out more lines to the Margaret. He then went to the dock and reported the position of his barge. He was told "they would get me after a while."

There is not the slightest evidence of any attempt by those of the tug to even find out what, if any, lines there were to the dock from the other boats in the tier, or between the boats, nor any examination whatever of the condition or location of any such lines.

Young, the mate, says: "I didn't do anything in making fast the barge. Our deckhand went on board the Keane. I didn't look

to see what lines the boat inside the barge had. I didn't know what lines the inside boat alongside the bulkhead had. I didn't look to see. I made no examination of the lines. I didn't tell the deckhand to make an examination."

The deck hand was not a witness, as he could not be found.

Young says, "It was up to the captain of the barge after we put a line out." He admits that "neither of the tier above or below the Keane would protect the Keane from the tide. He knew the tide would change in about 5½ hours."

There is testimony that the flood tide at that place is "stronger than the ebb."

Joyce, the captain of the Tracy, who apparently seeks, as I have said, to cast the blame on Young, says: "Our deck hand went over and put a line out and then came back and we went away. We put the Keane there at their (some man on the dock) risk."

The above is all that was done by the Tracy. It appears to me plainly insufficient under circumstances of danger clearly apparent. What could reasonably have been expected happened.

The ebb tide soon changed to flood. As the latter reached its full strength, the extra load of the Keane proved too much for the barges of the middle tier and the lines of the Mildred broke. She, together with the Margaret and the Keane, then drifted at the mercy of the tide.

Shortly thereafter the Mildred, being loaded, broke away from the other two barges. They remained tied together. The various collisions already indicated then occurred.

There is some dispute as to whether there is proof that the lines of the Mildred parted. I think the proof shows they did. This confusion in the testimony arises because the witnesses referred to different events.

As to when the barges first broke away, Keane on cross-examination testifies:

"Q. Whose line was it that parted? A. The Mildred's line—the loaded boat.

"Q. That was the second boat in your tier? A. Yes the second boat from the dock.

"Q. Did the inner boat in the tier break adrift? A. No."

The other reference is to the subsequent breaking away of the Mildred from the Keane and the Margaret.

■ The additional weight of the Keane therefore caused the breaking away of these three boats from the flotilla. There is an entire absence of evidence showing due care on the part of the tug Tracy in mooring this additional boat Keane at such a place and under such conditions and without any examination of the lines.

The collisions in this suit were the first to occur. I can find no intervening cause for them.

On the contrary, the carelessness of the Tracy appears to me to be plainly the direct cause for such collisions.

The boats broke away on the very first change of tide after the Keane had been tied up, a circumstance which should have been apparent as likely to occur to an ordinarily prudent captain.

These facts certainly called for some explanation on the part of the Tracy, either in the way of showing a reasonable examination of the lines, or that the Keane was moored safely so far as would be apparent to a reasonably prudent captain of the tug in the absence of a duty to make such investigation.

It would seem idle to here insist that those of the tug did not have to inspect "cleats," which duty apparently has not as yet been determined by the higher court of this circuit and, moreover, I believe the matter of "cleats" refers to the second breaking away of the Mildred.

■ There is no question but that where a tug has brought her barge to the place designated and moored her safely, the tug's task is completed. O'Boyle v. Cornell Co. (C. C. A.) 298 F. 95.

On the facts here the case of The Theodore Smith (D. C.) 271 F. 45, does not offer any excuse to the tug captain placing a barge where danger may plainly be apprehended.

Nor is this a case where it is shown that Keane chose the place and arranged or rearranged his lines. Brigham v. Cornell Co. (C. C. A.) 18 F.(2d) 92.

Counsel for the tug argues that "the tug fulfills its duty when it delivers the vessel to the consignee, at the consignee's dock, or, as near thereto as is practical," citing Schoonmaker-Conners v. N. Y. Tidewater Corp. (C. C. A.) 11 F.(2d) 470; The W. H. Baldwin (C. C. A.) 271 F. 411; The Milton (C. C. A.) 235 F. 287. But I do not understand that these authorities mean that a tug can be careless and then shift its responsibility for such carelessness to another.

Finally, counsel for the tug claims that the Keane was moored at the only available

place of consignment; that it was the consignee that was negligent. The proof, however, fails to substantiate this contention. Besides, there is some indication in the testimony that the Keane could have been safely placed elsewhere so far as the consignee is concerned. Whether this is so or not, there is nothing shown here except haste on the part of the tug, and she placed the Keane where she would likely overload the tier and was in apparent danger.

I do not believe that there is any authority holding that just because a barge is consigned to a certain location the tug may leave a barge in a plainly unsafe place without clearly showing that all that was reasonably necessary to be done by the tug in view of apparent conditions of danger was done or at least reasonable efforts were made to perform this duty.

The only remaining question is whether or not those in charge of the barges were careless?

I can see no carelessness on the part of those in charge of the Mildred. Her lines were apparently sufficient for the tier as made up before the Keane arrived. They became entirely insufficient when the Keane was carelessly attached to the tier. For this she should not be blamed in this suit. Aside from the question of whether the Margaret in fact did any damage the same statements would apply to her. She also had an anchor, although this was of no avail.

However, there is this additional question: There was no one on the Margaret.

Her claimant relies on the general rule stated in The Kathryn B. Guinan (C. C. A.) 176 F. 301. But Circuit Judge Ward also cites, in his opinion in that case, several cases such as The On-The-Level (D. C.) 128 F. 511; The Mary E. Cuff (D. C.) 84 F. 719; Campbell v. Penn. (C. C. A.) 85 F. 462, which indicate that particular circumstances must be considered on this question.

Accordingly, what could a man on the Margaret have done, if he had been present? He might have protested. Keane protested sufficiently for both, and without avail. The Tracy left immediately. Concededly there was no way for Keane to get lines over the Margaret to the bulkhead, in which work such man might have helped. Certainly there was no reason to presume that somebody would carelessly tie up the Keane to the Margaret.

I fail therefore to find any proof that the absence of a man on the Margaret, under such circumstances here, was the cause or contributed to the cause of the accidents that followed.

Nor do I find that Keane acted in any way except that of a reasonably prudent master.

This being so, I come to the same conclusion that Judge Coleman did, that the sole cause for this breaking away of the barges and their subsequent collisions with the vessels of libelant was the neglect to use reasonable care on the part of those in charge of the tug Tracy, in thus overloading the tier by the presence of the Keane, and without any examination whatever as to the lines of the barges to which she was moored.

Accordingly, I direct a decree for libelant against the tug Tracy and her owner with costs, and dismiss the libel without costs against the barges Mildred, Margaret, and Keane.