### THE ANNA O'BOYLE.

### THE ST. VINCENT.

### THE ST. LAWRENCE.

### THE CORONE.

### No. 15705.

District Court, E. D. New York.

Nov. 10, 1939.

Platow, Lyon & Stebbins and Edward F. Platow, all of New York City, for libellant.

Warner Pyne, of New York City, for Steamtugs St. Vincent and St. Lawrence.

Andrew J. Dritsas, of New York City, for Steamship Corone.

GALSTON, District Judge.

The Anna O'Boyle, an ocean going wooden barge of about 5,000 tons, and the O'Boyle Brothers, a sister barge of similar construction, were placed side by side in the mud flats known as Federal Anchorage No. 42, a public anchorage grounds off Kreichersville, Staten Island, some time prior to June 9, 1939. On that day the tugs St. Lawrence and St. Vincent took in tow the vessel Corone at Shooters Island and proceeded to Kreichersville, off the Kills, and moored the Corone alongside libellant's Anna O'Boyle. It is claimed that this was done against the protest of those in charge of the libellant's barge and that the mooring was negligently and carelessly effected with consequent damage to the barge.

The Anna O'Boyle lay on the bottom with decks awash at high tide, having been purposely filled with water in January and February of 1939. The barge is 267 feet long, 46 feet beam, 23 feet in depth. She has a forecastle deck and an after peak deck, hatches running practically the full length of the deck between the two poop decks. She was lying stern in, about 1,000 feet from the Staten Island shore. Work of reconditioning had been started, such as fixing up the steam lines for hauling pumps, working on the donkey boiler, ripping out pieces of deck and planks, work on the bulwarks and rails, and general repairs. The donkey boiler is on the main deck above water. The barge alongside, the O'Boyle Brothers, had been reconditioned and received her papers from the Bureau of Navigation the year before.

The Corone was not equipped with windlass, chain or anchors and was made fast to the barge by means of four wire cables which were handled under the direction of the captain of the tug St. Lawrence. The lines were made fast on an ebb tide. One ran from the stern of the Corone to the bow of the Anna O'Boyle; a bow line from the Corone to the stern of the Anna O'Boyle; and between the bow and stern lines two other cables were placed. These last two were supposed to be spring lines. Of one of these lines the opinion of one of the experts was that "The one leading to the bridge of the Corone (Amboy Exhibit 7) has some fore and aft lead, but it is more or less like a tugboat head line. It acts as a checking line as well as a breast line. It is not a proper spring line. The other one is absolutely no spring line at all; it is not even a breast line. It is an up and down lead and serves very little purpose at all other than as the tide raises the Corone it may straighten her up a little and take a little of that list out. * * * Those spring lines would permit her to move in and out, and I would say possibly a distance of from 10 to 15 feet from forward to aft."

The main act of negligence suggested is the overburdening of the stern bitt on the Anna O'Boyle. The starboard side of the Corone was made fast to the starboard side of the Anna O'Boyle. At high water the bow bitt of the Corone would be about 20 feet higher than the stern bitt of the Anna O'Boyle. The line which was made fast to the stern bitt of the Anna O'Boyle ran around the chock on the rail. There seems no doubt that the big afterchock serves the purpose of holding a tow and lining it in place fore and aft, and handling the towing hawser on a voyage at sea. DeMars, an expert surveyor and former tug captain, says that the main afterbitt is secured for a fore and aft pull and is neither constructed nor intended to take a side pull. The weight of the testimony convinces me that the use that was made of the stern-bitt and the after-chock, overburdened the bitt and accounted for its having been pulled to starboard, lifted on the port side, resulting in twisting of the entire structure to star-board. The damage certainly was of recent origin. There is no doubt that the motion of the Corone as she rode the waters put a strain

on the after-bitt in the relative positions in which the vessels were placed.· Particularly was this true in the circumstances in which one of the vessels, the Anna O'Boyle, was sunken, lying on· the bottom, while .the other rode with the tide. In this connection the broken starboard thumb of the after wooden chock and the manner of its use are significant.

I must conclude that there is evidence of negligence on the part of those concerned in the mooring operation. The Bartle Daly, 2 Cir., 58 F.2d 179; Automobile Ins. Co. v. Burns Bros., 2 Cir., 45 F.2d 605; New Jersey Shipbuilding & Dredging Co. v. Tracy Towing Line, D.C., 42 F.2d 1005; The City, D.C., 60 F.2d 169. The record also shows that the Corone rode up and down alongside the Anna O'Boyle and back and forth, particularly in the midship section, on changes of the tide or the pressure of the wind. Indeed, the report of John Rohde, employed by ,the U. S. Salvage Association,· Inc., who testified as a witness for the tugs, recites: "It was also noted that the barge Corone light, is secured to the sunken barge, Anna O'Boyle, and the starboard side of the Corone rides hard against the starboard side ;of the Anna O'Boyle at the place claimed by Mr. Moulton to be set in two inches. This condition has been going on for quite some time as the hull planks on the starboard side of the Corone are all badly chafed and worn down considerably."

The tugs supervised the handling of the lines and must be held responsible with the Corone for the resulting damage. The Corone was tied to the Anna O'Boyle without authority and against the protest of the watchman on board, at the request of her owners.

It is contended that the Anna O'Boyle had no commercial value and that therefore, assuming· a liability, there was no damage to that which was worthless. That cannot be concluded from the evidence. It is true that the barge was old and that part of its hull was rotten or worn. Apparently the owners thought well enough of the vessel to undertake repairs. How extensive the damage · done to bitt and planking and to the side .of the vessel is not now before us. It is sufficient to find that there was negligence and that .there was damage. The extent of the ·damage of necessity is left to be determined; but the libellant may have a decree. ··

If this. opinion is not in sufficient compliance with the rule requiring findings of fact and conclusions of law, submit findings of fact and conclusions of law. in accordance therewith.