P. DOUGHERTY CO. v. UNITED STATES et al.

THE MARYLAND.

THE L. B. CLARKE.

THE ISAAC S. HOPKINS.

SHERIDAN v. UNITED STATES et al.

THE ROCK HARBOR.

United States District Court
S. D. New York.
Dec. 1, 1951.

712

Foley & Martin, New York City (Warren Martin, New York City, of counsel), for libellant, Dougherty Co.

Bigham, Englar, Jones & Houston, New York City (Charles A. Van Hagen, Jr., New York City, of counsel), for libellant, D. T. Sheridan.

Myles J. Lane, U. S. Atty., New York City, (Leo J. Curren, Charles A. Blocher, New York City, of counsel), for United States.

Burlingham, Veeder, Clark & Hupper, New York City, (Frederic Conger, New York City, of counsel), for Moran Towing & Transp. Co., Inc.

CLANCY, District Judge.

### Findings of Fact.

1. On November 30, 1946 the tugs Howard C. Moore, Agnes A. Moran and Claire A. Moran, all controlled and operated by the impleaded respondent Moran Towing and Transportation Company, Inc., hereafter called Moran, towed, as a dead ship, the liberty ship Isaac S. Hopkins, which had been delivered on that day into Moran's possession and custody from the laid-up anchorage at Tarrytown, New York. Moran towed the Hopkins to New York Bay and anchored it in the neighborhood of the Statute of Liberty near bellbuoy 7.

In so far as the evidence goes, the Hopkins was anchored in the Bay for the convenience of Moran. She was allowed to remain there until the 2nd of December, 1946.

2. Before the 30th of November the barge Maryland and the barge Rock Harbor, both being at the time tight and seaworthy and properly manned and equipped, were anchored on Red Hook Flats, the Rock Harbor near buoy 30, the Maryland about 200 yards southeast of her.

3. The Hopkins was a dead ship without any steam even that quantity sufficient to operate the windlasses on which were wound her anchors and without any means of communication. A so-called "riding crew" of five was aboard her. The evidence gives no support to the use of the word 'crew' which has a professional connotation. We shall call them collectively "à gang". In the absence of evidence as to their qualifications it is found in the language used to describe them on the trial and to which neither the captain in charge of the towing operation nor his counsel demurred, that they were laborers unskilled in the rudiments of navigation or care of a ship. It is further found that none of these five individuals had the knowledge or the capacity to perform any duties aboard except such as a laborer might perform under the immediate personal supervision and according to the instructions of someone else who would know what to do and how to do it. These men were put aboard by the respondent Moran.

4. Upon reaching the anchorage and in obedience to the instructions of the master of the tug Howard C. Moore, who was in control of the operation, but one anchor, her starboard one, was put out. The length of the chain on which this anchor depended was not established by any credible evidence but the evidence of subsequent events was conclusive that its length was insufficient to hold the vessel in a strong wind.

5. Midday of December 2, 1946 a gale blew from the west and the tug Alice M. Moran was instructed by the Moran Company office by radio to examine the situation of the Hopkins and insure its security. The tug merely went to the neighborhood of the Hopkins which had then dragged her single anchor almost a mile from her original position, displayed no care whatever in discovering its situation and took no measures whatever to insure its safety despite the dangerous velocity of the wind then blowing and what was to be expected, storm warnings for small vessels having been then displayed and broadcast.

6. Within an hour thereafter the wind dislodged the Hopkins from the position she held when viewed by the Alice M. Moran's captain. She dragged her anchor southeasterly across the Bay, colliding first with the barge Rock Harbor and thereafter her midship section struck the stem of the Maryland across which she clung while the Maryland was carried to a point off the Brooklyn shore when the Hopkins grounded. Immediately after the collision with the Maryland the Hopkins dropped her second anchor.

7. Both the Maryland and the Rock Harbor were damaged and such damage was caused solely by the negligence of the Moran Company and its tugs above named. There is no evidence that the men aboard the Hopkins were employees of the United States or that their failure to act contributed in any respect to causing libellants' damage.

8. Each of the Moran tugs is separately owned apparently in a convenient corporation. It was stipulated however that all were operated and controlled by the Moran Company which on, before and after the 30th day of November, 1946, enjoyed a contract with the United States, No. WSA–3902, and designated GAA–Special 8–1–42 (Barge Service) to manage and conduct the business of vessels assigned to it by the United States from time to time of which the Hopkins, on November 30, 1946, was one.

9. The Moran Transportation and Towing Company, Inc. at the same time enjoyed what was designated as a master towing contract with the United States, No. WSA–4939. This contract with its later addendum never included the Hopkins.

The Hopkins was delivered to Moran on November 30, 1946 "under the terms and conditions of contract to be executed", such receipt being executed by both the United States Maritime Commission and Moran. Redelivery of the Hopkins to the Government was acknowledged on the 10th of January, 1947, the receipt reciting that such delivery was made under the terms of the Special Barge Contract WSA–3902, dated December 18, 1942, adverted to in the preceding finding. On April 8, 1947 another delivery receipt was executed by both the United States Maritime Commission and Moran providing precisely the same terms and reciting: "This certificate supercedes (sic.) and cancels any other previous certificate executed with Moran Transportation & Towing Co., Inc., to cover redelivery on the date shown above."

10. The putting of the riding gang on the Hopkins by Moran was done by Moran as the towing agent and not in accordance with the so-called service agreement.

11. Article 16(a) of this barge service contract, WSA–3902, provides that the United States shall indemnify * * * the General Agent against any and all claims and demands * * * asserted for injury to persons or property arising out of or in any way connected with the operation or use of said vessels or the performance by the General Agent of any of its obligations hereunder, including * * * claims * * * by * * * other vessels * * *

■ ■ 12. Article 16(c) reads: "In the event that the General Agent shall perform any stevedoring, terminal, ship repair or similar service for the vessels hereunder at commercial rates, the General Agent shall have all the obligations and responsibilities of the person performing such services under the standard or other approved form of contract with the United States or, in the absence of such standard or approved form, under usual commercial practice." The towing of the Hopkins by Moran and its tugs was either done under an independent hiring of itself by Moran as agent, pursuant to this paragraph of contract WSA–3902 or pursuant to the·

terms of a separate towing contract which was not put in evidence and about whose terms there was no testimony, in default of which it is found to have been a bare towage agreement imposing ordinary duties and liabilities on the tower.

Conclusions of Law.

■ 1. Moran and the tugs Howard C. Moore, Agnes A. Moran and Claire A. Moran were negligent in leaving the Hopkins improperly and insecurely anchored at Liberty Anchorage; in failing to take adequate precautions to prevent the Hopkins from drifting; and in selecting, employing and putting the incompetent riding gang aboard the Hopkins; in failing to give the members of that gang instructions as to their duties; and in failing to come to the assistance of the Hopkins when the respondent and the named tugs which had anchored it knew throughout the day of December 2 that she was in danger and that she constituted a menace to all the ships east of her in New York Bay.

■ 2. Moran was negligent in failing properly to inspect the situation of the Hopkins on the morning of December 2nd when conditions were so bad that the persons in the Moran office recognized that the situation of the Hopkins was dangerous to herself and to other ships in the Bay; in failing on that day to instruct the members of the riding gang to drop sufficient anchors; in failing to supervise the dropping of such anchors; and in failing otherwise to secure the Hopkins in a place of safety when to their knowledge and to the knowledge of the tug captain who was sent to inspect her position she had actually been moved by the wind almost a mile.

3. The libellants shall have judgment against the impleaded respondent, Moran Towing and Transportation Company, Inc. and the tugs Howard C. Moore, Agnes A. Moran and Claire A. Moran for their damages with costs to each libellant.

■ The defense submitted by the Moran Company is an unsupported assertion that it was moving the Hopkins only as a general agent for the result of which movement it was not liable or if liable that it was to be indemnified by the terms of the

general agency contract which have been found. In this theory we believe it mistaken. The towage was done under a separate contract. Whether that contract was made with itself by Moran in its capacity as general agent pursuant to article 16(c) recited in finding 12 or whether the hiring for the towage was a separate transaction between the representatives of the United States and Moran did not appear in the evidence but it appeared clearly and necessarily that the towing was done pursuant to a contract for the towing and nothing more. The language of the general agency contract does not provide for any towage by the agent as such agent. Existence of a separate contract appears from Moran's bills for its alleged service in towing and anchoring the vessel on November 30th and in resecuring her after the collisions on December 2nd and 3rd, all of which are addressed to the United States Maritime Commission and to Moran Towing and Transportation Company, Inc., general agents.

 The question of the in rem liability of the Hopkins arises. In The Pittston, 2d Cir., 279 F. 129, it was held that a barge was liable for half damages for merely fouling the berth of a moored vessel. The tug was not impleaded and the barge had anchored where she and the damaged vessel could not swing on a changing tide. The Anna O'Boyle, 2 Cir., 122 F.2d 286, affirmed the decision of the District Judge who had found the accused steamer negligent for choosing the berth. 30 F.Supp. 209, at page 211. The Court of Appeals found the steamer negligent in the participation of her crew in the mooring operation as well. 122 F.2d at page 288. That the five men put aboard the Hopkins by Moran were wholly incompetent is demonstrated by the evidence. They had no one in their charge so far as the evidence appears, certainly no licensed man; the reference to one of them as a boatswain made by the bargee of the Rock Harbor expresses the opinion of a person without means of knowledge. That the length of the anchor chain was too short is demonstrated by the prolonged dragging of it by the Hopkins across the Bay. This was dropped by these laborers as they have been called in the findings in accordance with the instructions of the Howard C. Moore's captain given from a position in which he could see neither the windlass nor chain. So it is quite understandable that they dropped a similarly short hawser after striking the Rock Harbor. That it too was short is evidenced by the fact that the vessel continued to drag almost another mile even with the Rock Harbor clinging to her. Apparently they maintained no watch whatever since no one speaks of the presence of any one of them on deck until after the grounding. Irresponsible as seamen are said to be ashore they would certainly maintain some sort of watch aboard ship if for no other consideration than their own safety. There was no reason to believe that such persons would know that a vessel was dragging or recognize any sounds as indicating a drag. They were incompetent to recognize any duty and none had been pointed out or assigned to them. Furthermore Moran has failed to offer any proof that they were employees of the United States. The General Service agreement WSA-3902, Art. 3A(d) provides for the engagement of a crew only by a duly appointed captain and we know of no presumption that persons aboard a dead vessel being towed are employees of the owner. Moran has put in evidence here the contract for towing the Hopkins from New York to Norfolk which, though it does not rule the relations of Moran and the United States in this case, is apparently a sample of the Government's standard towage contract and under its terms the men put aboard a dead ship by the towing agent remain always the employees of the agent [Art. 26] and are competent for no other task than handling lines. Delivery of the Hopkins to be towed was done on Moran's own evidence on a contract to be negotiated—acceptance of her delivery at destination under WSA-3902 merely discharged the Hopkins from that contract. Even competent proof of Government hiring would have been insufficient to save Moran in default of further evidence that what these laborers did or omitted to do contributed as a cause to the damages of the libellants.

To sum up the case against the Hopkins, its liability hangs on a presumption arising out of its collision with a moored barge which calls for explanation. The Havana, 2 Cir., 89 F.2d 23. That explanation was given in, and the presumption is rebutted by, the demonstrated negligence of Moran and its tugs that anchored the Hopkins and of the Alice M. Moran. Erie R. R. Co. v. Cornell # 20, 2 Cir., 164 F.2d 763; The May McGuirl, 2 Cir., 256 F. 20. If any intervening neglect contributed to the result it was Moran's burden to prove it. The B. B. No. 21, 2 Cir., 54 F.2d 532 at page 534; The Anna O'Boyle, supra. The respondents made no effort to do so.