AYRES MARINE SERVICE, Inc.
v.
W. HORACE WILLIAMS CO., Inc.

THE WAKULLA.

No. 14546.

United States Court of Appeals,
Fifth Circuit.

June 4, 1954.

George B. Matthews, Lemle & Kelleher, New Orleans, La., for Ayers, Marine Service, Inc., appellant.

Wm. B. Dreux, Jones, Walker & Waechter, New Orleans, La., for W. Horace Williams Co., Inc., appellee.

Before BORAH and RUSSELL, Circuit Judges, and DAWKINS, District Judge.

BORAH, Circuit Judge.

This appeal in admiralty is from an interlocutory decree of the District Court determining the rights and liabilities of the parties under a verbal contract in which Ayers Marine Service, Inc., agreed to furnish the Tug Wakulla to tow three barges of W. Horace Williams Company, Inc., from New Orleans to Port Aransas, Texas.

Libelant W. Horace Williams Company, Inc., the owner of the three barges hereinafter mentioned, instituted this action against respondent Ayers Marine Service, Inc., and the Tug Wakulla to recover the cost of repairs to the forward anchor winch [1] on pile driver barge 503, the damages resulting from loss of use of the barge, and other substantial expenses necessarily incurred. As to the nature of the occurrence which gives rise to the present controversy the libel alleged that while barge 503 and barges 403 and BSC 174 were in tow of the Wakulla in the Gulf Intracoastal Waterway the master and crew of the tug improperly used the anchor line and anchor winch at the bow of barge 503 to couple the barge with barge 403, thus putting an undue strain on the winch and causing it to be damaged. The respondent filed its claim as owner of the tug and an answer in which it denied that the damage was caused by any fault or neglect on its part. By way of further defense it set forth that the tug and tow were remade under extreme weather conditions which the flotilla encountered in Matagorda Bay, Texas, and if it was

---

1. The forward winch is of the Lambert two drum type and is used primarily in weighing anchor.

guilty of any fault causing damage the same was excusable as an error *in extremis*.

The cause came on for trial and after hearing the witnesses in open court and the argument of counsel the District Judge made and entered appropriate fact findings in which he found that the anchor winch had been improperly used and was strained and damaged due to the negligence of respondent in improperly coupling the barges, at a time when the vessels were in protected waters prior to their entry into Matagorda Bay. Thereafter, the court entered its interlocutory decree holding that libelant was entitled to recover the damages sustained by it in consequence of the matters referred to in the libel, together with interest and costs.

The narrow question presented on this appeal is whether the court erred in finding that when the tug and tow were in the sheltered waters of the Atchafalaya River the tug's personnel used the cable from the forward anchor winch on barge 503 to couple that barge on her starboard bow to the stern of the lead barge 403, and in doing so failed to snub off the cable on the towing bitts of barge 503 before running it to the lead barge. Respondent does not deny that such action was taken by the master and crew during some stage of the voyage and does not claim that the use which was made of the winch was proper nor does respondent question the court's findings (1) that during rough weather in the passage across Matagorda Bay the strain on the cable caused by the movement of the barges in the seaway was absorbed by the winch on barge 503, rather than by the bitts to which the cable should have been snubbed; and (2) that it was this strain which unseated the winch and caused the damage. However, respondent does vigorously insist that the tug first made use of the cable and winch as an emergency measure when it encountered a sudden norwester in Matagorda Bay. At that time and because of the action of the wind and waves it is claimed that the crew were unable to get

sufficient slack to snub off the cable on the bitts of barge 503, and that the tug master did not attempt to do so because of possible injury to his crew, and he should not be charged with negligence in making a decision which good seamanship would not condemn as unjustifiable under the circumstances then existing.

This brings us to a consideration of the evidence. On February 9, 1950, the tug Wakulla was proceeding westward in the Intracoastal Waterway towing astern on a 30 foot hawser and bridle, and in the order named, the lead barge 503, 129 feet long, 52 foot beam; 403, 120 feet long, 32 foot beam; and BSC 174, 60 feet long, 24 foot beam. The tow as thus made up proved difficult to handle because the wheel wash of the Wakulla against the model bow of barge 503 caused the tow to yaw. The master and crew made several attempts to correct this condition by adjusting the length of the hawser. However, these efforts proved ineffectual and it was determined to remake the tow putting barge 403 in the lead as that barge had a square bow which would follow the tug more easily. It is admitted by respondent that the tow was remade by the master and crew of the Wakulla either in the Atchafalaya River, or after crossing Bay Wallace at about mile post 82 west. The District Court found that this action was undertaken in the Atchafalaya River, which doubtless is correct and the answer of respondent so discloses. But what is here important is not the place where the tow was remade but rather whether or not it was remade under adverse circumstances which would have required unusual measures. The evidence shows that the tow was remade under favorable conditions. As a matter of fact the tow was tied up prior to making the desired change and it is not claimed and the evidence does not show that the weather was bad or that any lines had been broken thus far during the voyage.

The tow was first made up in libelant's yard at the Industrial Canal at New Orleans by its employees. This statement however, is subject to qualification as

the tug captain was asked where he wanted to put barge BSC 174 in the tow and he said he would make it up and he did. In making up the tow, barge 503, which had a model bow and a square stern, was placed in the lead. This barge had on it a large A frame, and, in addition to the other usual equipment of a pile-driving barge, there were two winches, one forward and one aft. The second barge in the tow was barge 403. This barge was made up tight to the stern of the lead barge. In securing the bow of barge 403 to the stern of barge 503 wire cable from libelant's yard was used to couple the barges on the port side while cable was run off the after winch on barge 503 to the bitts of barge 403 to make the starboard fastening. In making this coupling the cable from the winch was snubbed off on the bitts of barge 503 before it was made fast to the bitts on barge 403. The last vessel of the tow, barge BSC 174, was lashed to the stern of barge 403 with a rope. The barges were equipped with mooring lines but not hawsers and no representative of libelant accompanied the tow.

The tug captain Duet, who was respondent's principal witness, and indeed the only eyewitness to the occurrence, testified that in remaking the tow the pointed bow of barge 503 was made fast to the square stern of barge 403. He said that there were not enough lines on the barges to remake the tow and he had to use some of the lines from the tug on account of the bitts being so far back on the model barge. He did not say whether the tug furnished the line to port or starboard and we think that some explanation was required in view of libelant's uncontroverted testimony that the towage agreement contemplated that the tug would furnish the lines and that the barges apart from the steel cable were only equipped with mooring lines. It is true that Duet testified that the tug did at the inception of the voyage have a supply of lines amply sufficient to make up any four barge tow and that in rearranging the tow he had used only ropes between barges 403 and 503 prior to enter-

ing Matagorda Bay. However, he later qualified this statement by saying that he did not recall using any cable off the forward winch of barge 503 before entering the bay. According to his story the tug and tow were about half way across Matagorda Bay when a norwester blew up. At this time it was noticed that the coupling securing one corner of barge 503 to barge BSC 174 had become loose. On going aboard the tow to remedy this situation it was discovered that the coupling lines between barges 403 and 503 were in danger of breaking and for lack of other coupling lines it was necessary in the emergency to use the cable from the forward winch of barge 503 to couple the barges together. The tow then proceeded into sheltered waters and while in the canal it was noticed that the tow was real loose again. The tow was stopped and the master and other members of the tug's crew went aboard the barges and then observed that the winch was damaged so the cables were immediately snubbed up and the tow proceeded without further incident to Aransas Pass. But this is by no means the whole story. Five days after encountering the heavy weather on Matagorda Bay Duet gave a sworn statement to the insurance underwriter in which he said that it was during the storm on Matagorda Bay that it was discovered that the cable from the forward winch on barge 503 had pulled the winch drum loose from its moorings. When cross-examined as to this statement Duet said: "We might have found out in Matagorda Bay that it was pulled off. I do not remember how it happened." And when he was questioned by the trial judge he said that they were using the cable from the forward winch on barge 503 when the damage occurred but he did not remember whether it was during the storm or in the canal that he first noticed that there was damage to the winch.

The record standing thus, the trial judge found that when the flotilla was remade in protected waters the cable from the forward winch on barge 503 was used to make the starboard fasten-

ing to the stern of the lead barge, while either rope or cable lines were used to make the port connection; that the cable from the forward winch was not snubbed to a bitt on barge 503 before being run to barge 403 and as a result this winch was pulled from its seat and damaged. The court concluded as a matter of law that the towing vessel was not liable as as insurer of its tow or as a common carrier; that the burden in this case was on the libelant to prove negligence by a preponderance of the evidence; and that libelant had fulfilled its burden in that the evidence showed that it was the negligent failure on the part of respondent to snub the cable to the bitts on barge 503 which caused the damage to the winch. On the authority of The Quickstep, 76 U.S. 665, the court held that it was the duty of the towing vessel to see that the tow was properly made up and that its lines were sufficient and were securely fastened, and it further held that the doctrine of res ipsa loquitur was applicable to the circumstances of this case. As to the last mentioned holding the court pointed out that the tow, composed as it was of the tug and dumb barges, was under the complete control of respondent; and the fact that during the voyage the anchor winch on barge 503 suffered damage, obviously from strain improperly put upon it, gave rise to an inference of negligence which the respondent failed to explain or rebut.

If there was ever a question of fact for resolution by a trial court we think there was one here. The evidence with all the inferences that justifiably could be drawn from it seem not only to justify but indeed to require the findings that were made by the trial court which in any event cannot be said to have been "clearly erroneous".

Appellant's attack upon the court's conclusions of law is predicated upon the proposition that the trial judge erred in placing reliance on the doctrine of res ipsa loquitur. Appellant relies upon Commercial Molasses Corporation v. New York Tank Barge Corporation, 314 U.S. 104, 62 S.Ct. 156, 86 L.Ed. 89, 1941

A.M.C. 1697, which does indeed hold that the doctrine is an aid to the plaintiff in sustaining the burden of proving breach of the duty of due care but does not avoid the requirement that upon the whole case he must prove the breach by the preponderance of evidence. But what appellant overlooks is that the District Court did plainly state that the burden of proof was upon the libelant. And, while the court thought libelant was entitled to invoke the aid of the doctrine, it did not base its decision solely on that ground for it held and we think properly that libelant sustained its burden of showing negligence on the part of appellant by a preponderance of the evidence.

The other errors assigned have been carefully considered, but do not merit discussion.

For the foregoing reasons we think the decree of the District Court should be affirmed.