RUSSELL, POLING & COMPANY, New-town Creek Towing Company and Chester A. Poling, Inc., Libellants,

v.

TUG ALICE M. MORAN, her engines, etc., Tug Alice M. Moran, Inc., and Moran Towing & Transportation Company, Inc., Respondents.

United States District Court
S. D. New York.

Jan. 26, 1962.

Alexander, Ash & Schwartz, New York City, for libellants; Edward Ash, New York City, advocate.

Burlingham, Underwood, Barron, Wright & White, New York City, for respondents; Robert F. Lynch, New York City, advocate.

CROAKE, District Judge.

Russell, Poling & Company, Newtown Creek Towing Company and Chester A. Poling, Inc., filed this libel *in rem* against the Tug ALICE M. MORAN, her engines, etc., and *in personam* against the Tug ALICE M. MORAN, INC., and Moran Towing & Transportation Co., Inc. Libellant seeks to recover $17,000 for damages to its oil barge, the RUSSELL 22, claiming that the damage occurred in the Delaware River on January 6, 1959, while the barge was in tow of the tug ALICE M. MORAN. As indicated, the suit falls within the admiralty jurisdiction of this Court. The following facts are not in dispute:

On January 3, 1959, the RUSSELL 22, having no motive power, was taken in tow by the ALICE M. MORAN at Staten Island, New York, enroute for a salvage operation on a tanker known as the S.S. African Queen which was aground approximately 9½ miles off Ocean City, Maryland. The RUSSELL 22 is a steel oil barge, 230 feet long, 43 feet wide and 14½ feet deep. The RUSSELL 22 is equipped with six tanks divided into twelve compartments, six on the portside and six on the starboard side. A center

line bulkhead separates the compartments. The ALICE M. MORAN is 108 feet long overall, with a beam of 35 feet and a 16 feet 8 inch depth.

On January 4th, owing to rough seas, fresh winds and icy weather, the tug and tow abandoned the salvage operation and proceeded to the inside of the Delaware breakwater. Later that day the ALICE M. MORAN towed the RUSSELL 22 to a point further inside the breakwater, where the barge dropped both its anchors.

On January 5th, due to rising winds and heavy seas, the salvage master ordered the tug to tow the barge to Wilmington, Delaware, until conditions improved. At 5:30 P.M. on the same day, the tug, manned by a captain and crew, attempted to get under way with the barge, manned by a barge captain, and a deckhand. However, one of the anchors of the RUSSELL 22 was fouled on the bottom, making it impossible to raise the anchor. The anchor and its chains were lost. The tug finally got under way with the barge in tow, but due to icy weather conditions, the tug was unable to make fast both ends of the towing bridle to the barge. Instead, the tug towed the barge with a single bridle, approximately 45 feet in length attached to a cleat on the starboard bow of the barge. The other end of the bridle was in turn connected to a towing hawser approximately 450 feet in length which was connected to the stern of the tug. In this fashion, the tow proceeded up the Delaware River, though its original destination, Wilmington, was now changed to Sun Shipyards at Chester, Pennsylvania, so that the RUSSELL 22 might be fitted with a new anchor and chain.

At 7:30 A.M. on January 6th, at a point just below Wilmington, the captain of the tug decided to tow the RUSSELL 22 alongside. The hawser was shortened from 450 to 90 feet, so that the total length of the towing hawser and bridle was now about 135 feet. There was heavy ice over the bow of the RUSSELL 22; consequently, the barge captain and his mate were unable to disengage the bridle from the starboard cleat of the barge. With the towing line attached to the barge in this manner, the tug rounded to port, so that its portside came alongside the portside of the barge. The record indicates that at this time there was a northwest wind of from 18–23 knots.

After making fast to the barge, the tug and barge proceeded up the Delaware River, arriving at the Sun Shipyards at 9:50 A.M. of the same morning, where the barge was moored with its starboard side next to the pier. This was done without incident. One of the deckhands from the tug boarded the RUSSELL 22 and assisted the crew of the barge in mooring it to the dock. After mooring, the captains of the tug and the barge telephoned their respective employers to report the loss of the anchor. No mention was made of the alleged collision which is the subject of this libel. The ALICE M. MORAN remained at the Sun Shipyards until 12:15 P.M. on January 6th, 1959, after which she left for the Delaware breakwater. The barge underwent repairs and left Sun Shipyards on January 8th in tow of the tug McAllister bound for her previous anchorage at the Delaware breakwater. She arrived there on January 9th' and another attempt which was unsuccessful was made by the McAllister to bring the RUSSELL 22 alongside the African Queen. Again, because of heavy seas, the barge had to be returned to the breakwater as it was unable to approach within 500 yards of the African Queen.

On January 10th, the ALICE M. MORAN delivered supplies to the RUSSELL 22 while it lay at anchor at the breakwater, and on January 13th the ALICE M. MORAN picked up the barge captain and took him to Delaware City which was a trip requiring several hours. On January 18th, the RUSSELL 22 left the breakwater in tow of a tug Russell No. 16, bound for New York Harbor, arriving at Rosebank, Staten Island on the afternoon of January 19th. On the same day the RUSSELL 22 was shifted to New York Harbor by another tug, the

Valmet. The following day she was shifted into New York Harbor by tugs Russell No. 9, Raymond Russell and the Valmet. In the course of these shifts, she was alongside of the U.S.N.S. Bowitch and S.S. Dalton Victory for the purpose of discharging cargo. The next day, January 21st, she was shifted twice in the New York Harbor by the Russell No. 8, and in the course of these shifts left the S.S. Dalton Victory and went alongside the U.R.S. No. 31 at the Brooklyn Navy Yard for the purpose of taking on bunker oil in certain of her tanks. On or about January 20th or 21st, one of the crewmen on the RUSSELL 22 who had not been aboard when she was towed by the ALICE M. MORAN found a leak in the No. 1 port tank, and for the first time a report was made as to damage of the barge. This crewman testified that he made the report to his employer and to the barge captain who was aboard when the RUSSELL 22 was towed from the Delaware breakwater to Chester, Pennsylvania, by the ALICE M. MORAN. At the time of this report, the original barge captain reported for the first time that the ALICE M. MORAN had collided with the barge on January 6th in the area adjacent to the No. 1 tank. The libellant notified the respondent on January 22d, 1959.

Libellant's contention is that when the ALICE M. MORAN shifted its towing position to come alongside the portside of the RUSSELL 22 on January 6th, while still keeping its bridle attached to the cleat on the starboard side of the RUSSELL 22, the towing hawser became caught underneath the bow of the barge, pulling the two vessels together and causing the tug to collide with the barge in the vicinity of the No. 1 tank, resulting in the cracked hull. Libellant maintains that this maneuver was unseamanlike, that the tug captain, under the circumstances described above, was therefore negligent, and that respondent is liable for the resulting damage.

The respondent contends that the tug captain executed the "rounding to" in a seamanlike manner, that the tug was well fendered, that no violent contact occurred between the two vessels, and that libellant has not proven either that respondent's tug was negligent or that the crack resulted from any act attributable to respondent.

It is well settled that a tug is not the bailee of a barge which it has in tow. See Stevens v. The White City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699 (1932). Negligence, therefore, cannot be presumed merely from damage which is discovered after the barge had been in tow of the tug. Libellant has the burden of proving that the respondent was negligent and caused the damage. See The Eastern, 280 F. 711 (2d Cir. 1922); the S. & P. No. 15, 61 F.Supp. 846 (D.C.E.D. N.Y.1945). Libellant cannot rely solely on the doctrine of res ipsa loquitur to establish or prove negligence on the part of respondent. In Avres Marine Service, Inc. v. W. Horace Williams Co., Inc., 213 F.2d 27 (5th Cir. 1954), the libellant sought to invoke the doctrine of res ipsa loquitur to sustain its burden of establishing negligence on the part of the respondent. However, the Court in its opinion was careful to point out that, while the doctrine of res ipsa loquitur may be used as an aid to a libellant, the negligence of the respondent must be shown affirmatively by a preponderance of evidence. Under the federal rule, the doctrine of res ipsa loquitur does not shift the burden of proof to the party against whom it is being invoked. See Sweeney v. Erving, 228 U.S. 233, 33 S.Ct. 416, 57 L.Ed. 815 (1912), and Geotechnical Corp. of Delaware v. Pure Oil Co., 196 F.2d 199, 205 (5th Cir. 1952), cert. den. 344 U.S. 874, 73 S.Ct. 165, 97 L.Ed. 681 (1952).

On the trial, the libellant produced an expert who testified that in his opinion the captain of the barge ALICE M. MORAN did not exercise proper seamanship because the tug "rounded to" on the windward side of the barge, thereby increasing the possibility of a forceful contact between the vessels. He also testified on cross-examination that the wind would cause the barge to drift more rap-

idly than the tug. In the light of this testimony, it would appear to this Court that "rounding to" on the windward side would, if anything, mitigate the possibility of a forceful contact between the vessels. This same witness testified that "rounding to" on the portside with the tug hawser attached to the bridle on the starboard side was improper seamanship because the hawser or towing line could become caught as it passed under and around the port bow of the barge during the course of the maneuver and therefore cause the stern of the tug to strike against the portside of the barge.

The captain of the tug testified that, in performing the maneuver of bringing the tug alongside the barge on the date in question, the bight or loop of the hawser lay in a semi-circle behind the tug, and that the hawser did not get caught under the bow of the barge. He testified that the tug was well fendered around its stern, and that the river was relatively calm with a northwest wind of approximately 18–23 knots. He further testified that there was no forceful contact between the two vessels. His testimony also revealed that, after the maneuver, the tug had put out three lines to the barge and, after she was secured alongside, a deckhand from the tug went on the barge and assisted the bargemen in letting go the hawser which was then aboard the tug. No mention of the forceful contact was made at this time.

Libellant relied upon the testimony of the barge captain for its proof that there had been a violent collision between the tug and the barge. This witness testified, however, that he did not notify anyone of the alleged collision at the time of the accident, or thereafter, although he had many opportunities to do so. He admitted that he had no knowledge of the crack until he was notified some two weeks later by a subsequent barge captain. This same witness, although contending that the delay in the discovery of the damage was due to the residue of heavy oil, admitted that, when the barge was in the boatyard for repairs, the damage, if it then existed, could have been discovered through the use of facilities available in the yard. Under the circumstances, the Court finds it difficult to accept the testimony of this witness as to the alleged collision as credible. Surely, if some violent contact had occurred, he, as barge captain, would have made a more thorough investigation for damage.

There is other testimony offered by respondent and supported by testimony of libellant's barge captain that the barge was heavily laden with ice on the side where the alleged collision took place. Notwithstanding this fact, the testimony on behalf of each party was to the effect that the ice had not been cracked by the alleged contact between the two vessels. It is obvious that any collision, and certainly one of such force as is alleged here, would have cracked or crushed some of the ice in the area of the No. 1 tank. Under the circumstances, the Court is inclined to accept the testimony of the captain of the ALICE M. MORAN.

The failure of the barge captain to make complaint after the alleged collision and the fact that the barge was in service for some two weeks after the date of the alleged collision make the real cause of the damage a matter of speculation. In The Pride, 135 F.2d 999 (2d Cir. 1943), the Court of Appeals of this Circuit reversed a decree in favor of the libellant, on the specific grounds that the evidence of negligence was too speculative. In an effort to explain the delay in making the complaint of the damage and the subsequent use, the libellant, as noted above, offered testimony that the residue of heavy oil on the inside of tank No. 1 prevented leakage. Libellant contends that, due to this factor, the barge was subsequently used without knowledge of the damage. This argument is not persuasive because the same condition might have also prevented discovery of the crack if it existed prior to the time that the ALICE M. MORAN took the RUSSELL 22 in tow. As a matter of fact, the same type of oil was in the tank when the damage was discovered. Thus the Court is of the opinion that the delay

in reporting the incident and the subsequent use are important factors in resolving this case.

In the Henry F. Will-Lester C. Clark, 1930 A.M.C. 540 (D.C.S.D.N.Y.), the Court stated, "If the damage was in fact done by the Will, it is utterly inexplicable why some complaint should not have been made contemporaneously or at least very soon afterwards." (P. 541). The Court dismissed the libel although only four days had elapsed from the date of the alleged collision. Here we have a delay of some two weeks between the date of the alleged collision and the date respondent was notified. In The Don-The Ashbourne, 61 F.Supp. 914 (D.C.E.D.N.Y.1945), the Court considered the subsequent use of the vessel as an important factor in denying relief. This same factual circumstance contributed to the holding in The Henry F. Will-Lester C. Clark case, supra. Similarly, the subsequent use of the RUSSELL 22 in choppy seas is a circumstance which "is certainly mute evidence that contradicts any theory of violent collision." 61 F.Supp. 915.

In the opinoin of the Court, the circumstances in this case and the factual circumstances deemed to be relevant in the cases mentioned above are analogous. Libellant has failed to present credible evidence to prove the negligence of respondent, and the factual cause of the damage is still a matter of conjecture.

The libellant urges that the rule set forth in Allied Chemical & Dye Corp. v. The Christine Moran, 190 F.Supp. 703 (S.D.N.Y.1961) would impose liability on the respondent. In that case the Court held that "the tug is considered the dominant mind in the tug-tow flotilla," (190 F.Supp. at 706), and accountable, therefore, for any damage to the barge while in tow. With this we may agree. However, in that matter the tug had abandoned the barge in the face of an oncoming storm, with resulting injury to the barge. The act of abandonment was held to be negligence and to have caused the injury complained of by the libellant.

Nothing in that decision is inconsistent with this opinion for, in the Allied Chemical case, supra, the Court specifically held that "the tug is not liable for damage in the absence of negligence. And that negligence must be the proximate cause of the injury, before any liability can be imposed on the tug." 190 F.Supp. at 706. As was noted above, libellant has not proven either the negligence of the tug or the cause of the damage.

The libellant urges that the decision of The Clarence P. Howland, 16 F.2d 25 (2d Cir. 1926) would create a presumption of negligence in its favor. In that case the Court stated that, if a collision occurs under circumstances in which a collision would not ordinarily occur if proper care had been taken, a presumption of negligence arises. In the Howland case, supra, the respondent did not deny that there was a collision causing injury. The only issue was whether the respondent had been negligent in not avoiding the collision. In the instant case libellant has failed affirmatively to prove any connection between the injury or damage and the alleged collision, or, in fact, that any collision did take place. There are no circumstances, therefore, which would warrant a presumption of negligence.

Upon all the evidence presented at trial of this libel, the Court is of the opinion that the libellant failed to prove that there was any act or conduct, negligent or otherwise, which caused the damage to the barge of the libellant. There was also a failure to demonstrate that the captain of the tug exercised improper seamanship which caused damage to the barge.

Accordingly, the libel is dismissed with costs.

The foregoing opinion shall constitute the findings of fact and conclusions of law, pursuant to Rule 46½ of the Supreme Court Admiralty Rules, 28 U.S.C.A.

Settle decree on notice.