373 F.2d 54
 LOGAN CHARTER SERVICE, INC., in personam and the TUG CITY OF
JOLIET, Her Engines, Tackle, Furniture, etc., in
rem, Appellant,
v.
CARGILL, INC., The Continental Insurance Company, United
Barge Co., Inc., Dairyland Power Co-operative and
the United States of America, Appellees.
 No. 18088.
 United States Court of Appeals Eighth Circuit.
 Feb. 6, 1967.
 
 George B. Matthews, of Lemle & Kelleher, New Orleans, La., for appellant; Curtis L. Roy and Dorsey, Owen, Marquart, Windhorst & West, Minneapolis, Minn., were with him on the briefs.
 T. C. W. Ellis, of Faris, Ellis, Cutrone, Gilmore & Lautenschlaeger, New Orleans, La., for appellees Cargill, Inc., Continental Ins. Co., United Barge Co. and Dairyland Power Cooperative; Richards, Montgomery, Cobb & Bassford, Minneapolis, Minn., were with him on the brief for those appellees.
 Martin Jacobs, Atty., Dept. of Justice, Washington, D.C., for appellee United States; John W. Douglas, Asst. Atty. Gen., David L. Rose and Miles W. Lord, U.S. Atty., Minneapolis, Minn., were on the brief.
 Before VOGEL, Chief Judge, and MATTHES and MEHAFFY, Circuit Judges.
 MEHAFFY, Circuit Judge.
 
 
 1
 This appeal is from a decree of the United States District Court for the District of Minnesota, sitting in admiralty, growing out of a collision of the tow M/V CITY OF JOLIET with Lock and Dam. No. 3 on the upper Mississippi River. The District Court found the crew of the CITY OF JOLIET at fault for the collision and awarded damages for the loss of the barge and its cargo and for damage to the dam. We affirm.
 
 
 2
 A number of interests are involved. Dairyland Power Cooperative, a libelant-appellee, owned the sunken barge DP-223. Libelant-appellee, United Barge Company, Inc., was the owner pro hac vice of the sunken barge DP-223. Libelant-appellee, Cargill, Inc., owned the barge's cargo of rye. Respondent-appellant, Logan Charter Service, Inc., was the owner pro hac vice of the tug CITY OF JOLIET. Logan bareboat chartered the CITY OF JOLIET from the American Commercial Barge Lines and contracted with Cargo Carriers, Inc. to tow barges between specified points for a daily rate. The tow involved here was made up in St. Paul, Minnesota, and consisted of three tiers of two covered graincarrying barges each, with barge DP-223 occupying the port side of the aft tier. The CITY OF JOLIET faced up to the stern of the tow.
 
 
 3
 On a voyage down the Mississippi River from St. Paul, a tow must transit a number of locks. The lock and dam involved is located near Red Wing, Minnesota and is owned by the United States and operated by its Corps of Engineers. The lock is on the right descending bank of the river and has a six hundred foot long guidewall on the up-river side. Opposite the guidewall is a shorter wall-- a 'bullnose'-- which extends a short distance upstream from the lock's upper gate. Dam No. 3 is east of the lock. The current approaching the lock and dam flows into the right or west bank above the guidewall, and then moves to the left bank toward the dam, creating a strong 'outdraft.'
 
 
 4
 The crew of the CITY OF JOLIET consisted of Captain Radford, Pilot Houchins, Mate Rinehart, and deckhands Evans and Sellars. The locktenders were Hartnagel and Flynn, civilian employees of theCorps of Engineers. The record contains the testimony of each of the above except Rinehart, who did not testify. The accident occurred when the CITY OF JOLIET lost control of her tow while attempting to maneuver into position to negotiate the lock, resulting in the tow colliding with the up-river side of the dam causing the barge DP-223 and its cargo to sink. The CITY OF JOLIET, with the assistance of another tug which arrived from downstream, rescued the other five barges.
 
 
 5
 The following Findings of Fact of the District Court aptly describe the events occurring immediately before and resulting in the collision:
 
 
 6
 '12. Prior to 12:00 o'clock midnight Captain Radford was the pilot on duty. He was relieved at midnight by Pilot Houchins. Prior to being relieved Captain Radford had experienced difficulty and had spent some time (30 to 45 minutes) in attempting to maneuver the tow into position to enter the lock chamber. About the time that Captain Radford was being relieved he told Pilot Houchins, 'there is an awful outdraft here-- we are having a little difficulty getting our tow in the chamber of the lock.' After Pilot Houchins took over as pilot he attempted for a considerable time (30 to 60 minutes) to bring the tow into the guidewall. Both Captain Radford and Pilot Houchins were experienced river pilots.
 
 
 7
 '13. The Joliet in approaching the lock engaged in a flanking operation. The head of the tow was pointed out in the river and the stern was placed next to the right descending bank. The tug continued to flank the stern starboard barge down on the upper guidewall. Nylon lines were placed on the buttons on the guidewall and on cavils on the stern starboard barge. The pilot then went ahead on the port engine and backed up slow on the starboard engine. The steering rudders were thrown hard down to starboard and the backing rudders were thrown down hard to port. The two lines on the starboard stern barge were being held. This involved a kind of pivoting operation. The head of the tow moved slowly to starboard and toward the guidewall. There was increasing strain on the stern lines caused by the outdraft and the movement of the engines. In a customary maneuver when the bow reaches the guidewall the stern of the tow will be close or against the guidewall and the stern lines will be cast off and the tow will proceed along the guidewall and into the lock chamber.
 
 
 8
 '14. Locktenders Hartnagel and Flynn were on duty at the lock at the time of the accident. Deckmen Rinehart and Evans were on the stern starboard barge. Deckman Sellars was at the bow of the tow. Evans was near the stern end of the stern starboard barge, and Rinehart was more forward of Evans on the same barge. Hartnagel threw heaving lines to Rinehart and Evans, who passed nylon lines back to Hartnagel who then put the nylon line on a button on the guidewall. Evans then wrapped the nylon line around the cavil on the barge and made it fast with a figure eight and three or four loops. The starboard side of the tow was then fifteen to twenty feet from the guidewall. The stern proceeded to go away from the lock wall and made the lines tighter. Evans made more loops and let the line play, but the line kept getting tighter and tighter. He let out as much line as he could to keep the line from breaking. The line got down to all that Evans could hold and all that he could wrap around, and at the time that he was holding only the end of the line he was forced to let go. Rinehart was doing the same thing with his line and he let go a few minutes later. The stern of the tow continued to fall off. The engines of the Joliet were reversing. After Evans and Rinehart let their lines go, the tow went cross-ways into the dam. The nylon lines, which were relatively new, did not part or break. Hartnagel told Evans to keep the lines tight. Evans heard no instructions of any kind from Pilot Houchins.
 
 
 9
 '17. Locktender Flynn assisted at the guidewall near the bow of the starboard barge. Deckhand Sellars was at the forward end of the barges. Flynn tied a nylon line to the button on the guidewall. Sellars tied his line to the cavil on the barge and held it. Flynn said nothing to Sellars. The tow line did not break. Sellars could no longer hold the line and let go. Sellars received no instructions from Pilot Houchins.
 
 
 10
 '18. The tow moved ahead slowly. The stern was too far out. Pilot Houchins decided to go in. The two stern lines were slacked off and cast off. The tow moved forward but was swinging out. Hartnagel became concerned about the barge striking the upper right gate, which would cripple the lock for a month. Hartnagel told Pilot Houchins to back down. Houchins started backing, the stern kept swinging out, and the current again caught the tow. The bow of the barges cleared the bull nose. The crash of DP-223 into the pier nose of the dam occurred about 1:00 a.m. on June 8, 1963.'
 
 
 11
 After finding that the testimony of Captain Radford and Pilot Houchins was 'in many respects unworthy of belief and in some respects incredible,' the court found that each was guilty of negligence.[1]
 
 
 12
 The court also found that deckhands Rinehart and Evans were negligent in failing to hold the stern lines tight as ordered. Additionally, the court found that deckhand Sellars was guilty of some slight degree of negligence in his handling of the bow lines. The court ultimately found that the sole direct proximate cause of the collision was the negligent operation and navigation of the CITY OF JOLIET by employees of Logan Charter Service, Inc.
 
 
 13
 Appellant's principal argument for reversal is that the trial court erred in finding appellant, rather than the Government, at fault. The only witnesses to the collision were employees of appellant and the Government, who gave conflicting versions of how the collision occurred.
 
 
 14
 According to the Government's witnesses, the flotilla's approach to the guidewall was normal but the stern was never maneuvered closer than forty feet to the wall. Thus, the flotilla never achieved a proper position to transit the lock. Employing a 'flanking maneuver,' the flotilla approached the guidewall with the head barges angling out in the river. When the stern was fifty or sixty feet from the wall, mooring lines were secured from the aft starboard barge to the guidewall. The lines were tied so that the deckhands were able to control the lines, releasing them gradually, to help bring the tug closer to the guidewall. The tug pilot maneuvered the head of the tow from its outstream position into proper position near the wall, ready to negotiate the lock if the stern barges and the tug also had been brought into proper position alongside the wall. Thus, according to Government witness Hartnagel, the flotilla was not ready to enter the lock as its stern was too far out. Nevertheless, Hartnagel testified, the flotilla started forward and he heard Pilot Houchins say, 'O.K.. Let her go. We're going in.' The deckhands on the aft barge cast off the lines. Surprised and frightened at the improper approach, Hartnagel warned the tug to back out, knowing otherwise the flotilla would damage the lock. The pilot then attempted to back away but the flotilla was caught in the current and cast upon the dam with the resulting damage to the dam and sinking and loss of barge DP-223 and its cargo.
 
 
 15
 Hartnagel's testimony is supported by the testimony of the other Government witnesses and by the written statements of the pilot of the tug made shortly after the occurrence of the accident. The log entry contains this statement of the pilot:
 
 
 16
 '11:15 A.M.-- 12:00 M./P.-- flanking down #3 running water.
 
 
 17
 '1:00 A.M.-- Stern got out to wide tow topped across Dam DP-223 got two holes knocked in it. One in Bow Rake & one in No. 1 hold-- stb side & taking water fast-- can't get DP-223 off dam-- too much current.'
 
 
 18
 The accident report reflects the following statement from the pilot:
 
 
 19
 'Nature of Accident.
 
 
 20
 'Left-out draft boat wood not lift-- sturn line let go on sturn went board side onto pier noses.'
 
 
 21
 Additionally, an expert witness testified that for proper entry in the lock, the stern might be a little ways out but not far, and that it would be very dangerous to cast off the stern lines while at the mercy of the current.
 
 
 22
 Contrary to the above recited testimony, appellant produced evidence that locktender Flynn, a farm laborer relatively unskilled at directing river traffic, positioned on the wall near the bow of the flotilla, ordered the bow or head of the tow tied off and its forward motion stopped as the flotilla was attempting to enter the lock, causing the stern to be carried out into the current and onto the dam. It would serve no useful purpose to point out the other conflicts in the evidence or various inferences that might be drawn therefrom.
 
 
 23
 Our standard of review in cases of this kind is found in McAllister v. United States, 348 U.S. 19 at page 20, 75 S.Ct. 6, at page 7, 99 L.Ed. 20 (1954), where the Supreme Court said:
 
 
 24
 'The first question presented is whether the Court of Appeals in reviewing the District Court's findings applied proper standards. In reviewing a judgment of a trial court, sitting without a jury in admiralty, the Court of Appeals may not set aside the judgment below unless it is clearly erroneous. No greater scope of review is exercised by the appellate tribunals in admiralty cases than they exercise under Rule 52(a) of the Federal Rules of Civil Procedure.'
 
 
 25
 Our latest expression on the clearly erroneous rule is found in Worthen Bank & Trust Co. v. Franklin Life Ins. Co., 370 F.2d 97 (8th Cir. 1966). See also Travis v. Motor Vessel Rapids Cities, 315 F.2d 805, 809-810 (8th Cir. 1963), where this court applied the clearly erroneous rule in an admiralty case. The trial court credited the testimony of the Government witnesses and characterized the testimony of the Captain and Pilot of the CITY OF JOLIET as being 'in many respects unworthy of belief and in some respects incredible.' The trial court could properly make such determinations. See Worthen Bank & Trust Co. v. Franklin Life Ins. Co., supra. A canvass of the record reveals ample evidence to support the finding that appellant's crew members were negligent in attempting to transit the lock when the stern was far outstream at the mercy of the current and the bow near the wall; that the pilot and crew should not have attempted a forward movement or cast off their lines, placing them in such a perilous position certain to result in disaster. The court was fully justified, therefore, in finding appellant guilty of negligence which caused the collision and that the Government was guiltless of actionable negligence.
 
 
 26
 Appellant next contends that the District Court erred in applying the common law rule of proximate cause. It asserts that the test of causation in admiralty is not 'proximate cause,' but rather 'contributing cause' and the accompanying concept of divided damages. This admiralty rule applies only where two parties are jointly responsible for a tort. It has no bearing here as the court specifically found that the Government locktenders were not negligent. The court further found that the negligence of the crew of the CITY OF JOLIET was 'the sole direct or proximate cause of the collision.' This assignment of error is prompted by the court's additional finding that if either of the Government employees was negligent, his negligence was not a direct or proximate cause of the accident. Obviously, this latter finding was merely explanatory and unnecessary in light of the court's specific finding of no negligence on the part of the Government's employees. At most, it was an explanation of a simple rule of tort law and could not possibly result in any prejudice to appellants.
 
 
 27
 Appellant complains of the court's statement that the doctrine of res ipsa loquitur was applicable to the instant case. As a general proposition, this doctrine is applicable to admiralty cases.[2] In the instant case, the trial court attributed liability solely to the specific negligence of the crew of the CITY OF JOLIET. The court's conclusion was not based on the doctrine of res ipsa loquitur. And in this aspect, the case is analogous to Ayres Marine Service v. W. Horace Williams Co., 213 F.2d 27, 30 (5th Cir. 1954), where the court there properly, we think, rejected a similar contention as appellant here advances.[3]
 
 
 28
 The argument is also made that the doctrine does not apply where there is joint control or responsibility, but as the court exonerated the locktenders of negligence, it follows that there was no joint control or responsibility making the doctrine of res ipsa loquitur inapplicable.
 
 
 29
 Finally, appellant contends that the court erred in not holding that the lock operators were in charge of the navigation of the CITY OF JOLIET and flotilla.[4] The argument is based upon a regulation of the Secretary of the Army pursuant to 7 of the River and Harbor Act of August 8, 1917, 40 St. at 250, which provides:
 
 
 30
 'AUTHORITY OF LOCKMASTERS. The movement and position of all boats and floating craft of every description while at or near the locks and dams and in canals shall be subject to the direction of the lockmaster, whose orders shall be obeyed in the operation and mooring of such boats and craft. * * *'
 
 
 31
 A reading of the other regulations makes it clear that this regulation was not designed to absolve the crew of an approaching vessel from negligence. For example, the regulations require a vessel to approach the lock with caution and forbid its entering the lock until the lockmaster signals for entry. The regulations specifically provide that they shall not affect the liability of the owners and operators for any damage caused by the operations to locks or other structures.[5] Additionally, we note that Congress has enacted rules for navigation of the Mississippi River, 33 U.S.C.A. 301 et seq. 33 U.S.C.A. 351 provides that nothing in the rules 'shall exonerate any vessel, or the owner or master or crew thereof * * * of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case.' The record shows that the locktenders were not seamen and had no control over the navigation of the flotilla other than to forbid its entry into the lock until the entrance could be safely accomplished. They could not be held responsible for the crew's failure to maneuver the flotilla into proper position to enter the lock.
 
 
 32
 In urging this point, appellant relies upon the case of Rebel Towing Co. v. United States (S.D.Tex. Admiralty #64-H-67 Mar. 3, 1965), an unreported district court opinion appended to appellant's brief. In Rebel Towing, the trial court found the accident occurred after the tow had entered the lock and its control turned over to the lockmen who were moving the barges by the use of moving cavils on the lock. The court found the lock operators at fault and found that the owners and operators of the tug were guilty of no fault which caused the collision. Rebel Towing is obviously distinguishable.
 
 
 33
 In our opinion, appellant's suggested construction of the regulation is erroneous as it is inconsistent with other regulations and statutes. Our canvass of the record as a whole leads us to conclude that the evidence justified the court's findings and conclusions that the members of the crew of the CITY OF JOLIET were negligent, and that such negligence constituted the sole proximate cause of the collision.
 
 
 34
 The record is free of prejudicial error and the judgment of the District Court is affirmed.
 
 
 
 [1]
 The court found as to the negligence of Radford and Houchins the following:
 '22. Captain Radford was in complete charge of the tow. He and Pilot Houchins were responsible for the navigation of the tow and placing the tow in the lock chamber.
 '23. Radford permitted Houchins to relieve him at a time when the tow was in a difficult situation. Radford decided to let Houchins extricate himself from this position of danger. Radford was negligent.
 '24. After being relieved, Radford absented himself for a short time but soon reappeared. He failed to give proper assistance or direction to Houchins. Radford was negligent.
 '25. Radford ordered the two stern lines held tight. The two stern lines were not held tight. Radford failed to obtain observance of his orders. Radford was negligent.
 '26. Customary or normal procedure required that the stern end of the tow be brought in near the guidewall. Captain Radford failed to navigate the tow into proper position. Radford was negligent.
 '27. Customary or normal procedure required that the starboard side of the stern barge be kept or maintained near the guidewall. Pilot Houchins failed to keep or maintain this position. Houchins was negligent.
 '28. Customary or normal procedure required that when the head of the tow touched the guidewall that the stern of the tow maintain a proper position. Pilot Houchins permitted the stern of the tow to angle out. Houchins was negligent.
 '29. Customary or normal procedure required that the stern of the tow be reasonably close to the guidewall so that the stern lines could be cast off and the tow proceed ahead into the lock chamber. Pilot Houchins failed to properly navigate the tow to make this possible. Houchins was negligent.
 '30. The Joliet was powered by two 600 horsepower engines. Pilot Houchins believed that the engines had horsepower of 2400. Houchins' experience on Diesel towboats related to engines with 1800 to 3600 horsepower. A pilot should be familiar with the power under his control. Houchins did not have this knowledge. Houchins was negligent.
 '31. When the stern and bow lines were let go, Pilot Houchins had the duty to reasonably and properly back down or back out. He failed to navigate the tow in a reasonable and proper manner. Houchins was negligent.'
 
 
 [2]
 It is stated in 2 Am.Jur.2d Admiralty 206 (1962), 'The doctrine of res ipsa loquitur is recognized and applied in admiralty.' See also The Anaconda, 164 F.2d 224, 228 (4th Cir. 1947), and cases therein cited
 
 
 [3]
 In Ayres Marine, supra 213 F.2d at page 30, the court said:
 'Appellant's attack upon the court's conclusions of law is predicated upon the proposition that the trial judge erred in placing reliance on the doctrine of res ipsa loquitur. Appellant relies upon Commercial Molasses Corporation v. New York Tank Barge Corporation, 314 U.S. 104, 62 S.Ct. 156, 86 L.Ed. 89, 1941 A.M.C. 1697, which does indeed hold that the doctrine is an aid to the plaintiff in sustaining the burden of proving breach of the duty of due care but does not avoid the requirement that upon the whole case he must prove the breach by the preponderance of evidence. But what appellant overlooks is that the District Court did plainly state that the burden of proof was upon the libelant. And, while the court thought libelant was entitled to invoke the aid of the doctrine, it did not base its decision solely on that ground for it held and we think properly that libelant sustained its burden of showing negligence on the part of appellant by a preponderance of the evidence.'
 
 
 [4]
 'The navigation of the tow in approaching the guidewall or the lock chamber is the responsibility of the pilot. In approaching the lock the lockmaster has authority to protect the safety of the lock and dam structure. The lockmaster can halt a hazardous approach by barring entry to the lock. The lockmaster cannot order and control the maneuvers for a safe approach. The lockmaster does have control in the handling of a tow once the tow is in the lock chamber.'
 
 
 [5]
 'Vessels must approach the locks with caution and shall not enter nor leave the lock until signaled to do so by the lockmaster
 'In no case will boats be permitted to enter or leave the locks until directed to do so by the lockmaster.
 'The regulations contained in this section shall not affect the liability of the owners and operators of floating craft for any damage caused by their operations to locks or other structures.'